**William S. BURFORD et al., Appellants,**

**v.**

**CITY OF AUSTIN et al., Appellees.**

**No. 11189.**

Court of Civil Appeals of Texas.

Austin.

May 13, 1964.

Rehearing Denied June 10, 1964.

Will Wilson, Joe Osborn, Austin, for appellants.

Doren R. Eskew, City Atty., Paul D. Jones, Asst. City Atty., Clark, Thomas, Harris, Denius & Winters, Mary Joe Carroll, Austin, for appellees.

ARCHER, Chief Justice.

This is an appeal from the judgment of the trial court upholding an amendatory zoning ordinance changing the zoning classification of three adjacent lots from zoning permitting only a single-family or duplex to that permitting an apartment house.

Appellants are home and property owners in the neighborhood or area of the lots and brought this suit seeking a declaratory judgment that the ordinance was invalid and a temporary injunction, which was granted. On the hearing before the court on the merits, the temporary injunction was dissolved and judgment entered denying the relief sought and upholding the validity of the ordinance.

The appeal is predicated on eight points assigned as error and are in effect that the court erred in failing to hold that the ordinance was invalid because such creates a spot zone contrary to the principle; that spot zoning is illegal; that the ordinance was invalid as being arbitrary and unreasonable and not within the authority to zone delegated to cities by Article 1011a, Vernon's Ann.Civ.St., in that this ordinance failed to further the health, safety, morals, or general welfare of the community and because there is no public need for addi-

tional land zoned for apartments or apartment hotels and because Mayor Lester Palmer was legally disqualified to vote for the passage of the ordinance; that the court erred in excluding evidence of the relationship between interested parties because such evidence would have shown the arbitrariness of the action of the council.

The ordinance in question in part reads as follows:

"ORDINANCE NO. 63 0214–B

"AN ORDINANCE ORDERING A CHANGE IN USE AND HEIGHT AND AREA AND CHANGING THE USE AND HEIGHT AND AREA MAPS ACCOMPANYING CHAPTER 39 OF THE AUSTIN CITY CODE OF 1954 AS FOLLOWS: FROM 'A' RESIDENCE DISTRICT AND FIRST HEIGHT AND AREA DISTRICT TO 'B' RESIDENCE DISTRICT AND SECOND HEIGHT AND AREA DISTRICT ON THREE (3) TRACTS OF LAND FRONTING 218 FEET ON THE WEST RIGHT-OF-WAY LINE OF SALADO STREET AND 218 FEET ON THE EAST RIGHT-OF-WAY LINE OF SAN PEDRO STREET, LOCALLY KNOWN AS 2810–2816 SALADO STREET AND 2811–2817 SAN PEDRO STREET, IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS; AND SUSPENDING THE RULE REQUIRING THE READING OF ORDINANCES ON THREE SEPARATE DAYS.

"BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF AUSTIN:

"PART 1. Chapter 39 of the Austin City Code of 1954 is hereby amended to change the USE and HEIGHT and AREA designations from 'A' Residence District and First Height and Area District to 'B' Residence District and Second Height and Area District

on the following described property, to-wit:

"Three (3) tracts of land fronting 218 feet on the west right-of-way line of Salado Street and 218 feet on the east right-of-way line of San Pedro Street, beginning at a point 200 feet south of the south right-of-way line of West 28½ Street; and having a depth of 151.66 feet.

\*     \*     \*     \*     \*     \*

"PART 2. It is hereby ordered that the USE and HEIGHT and AREA maps accompanying Chapter 39 of the Austin City Code of 1954 and made a part thereof shall be changed so as to record the changes ordered in Part 1 of this Ordinance."

At a regular meeting of the City Council on December 16, 1962, the zoning application involved in this proceeding was heard and action was had as follows:

"The Planning Director gave a resumé of the area and of the changing conditions, and stated after considerable study, the Planning Commission found that 'BB' Residence 1st Height and Area was the most suitable zoning for the area. He pointed out development would be slow. This classification was recommended in the Master Plan. MR. A. W. PENN, representing himself and a large group of home owners, opposed the change that would affect a great number of University professors who had built the area up and maintained it. He pointed out the streets were not designed to take care of the type of parking that would result from this development. DR. G. SMITH, Director of Law Science Institute expressed opposition against apartment development, as the area was not a degraded area, and that apartments are not as desirable as some might think. A law student who manages Windsor Oaks and River Oaks Apartments expressed opposition,

pointing out many disadvantages to an area by the development of the multi-unit apartments; that those paying $200 monthly had to walk two blocks from their parked cars to their apartment; that tenants were coming and leaving at all hours of the night; and that there were more parties in the big apartment houses than the smaller ones. MR. THEO BELLMONT, representing himself and the Heritage Society opposed the change, stating his protest was on the interior of the area rather than on the boundary street; and if it were changed for multi-apartments, it is the beginning of the end of this neighborhood for these University professors. MRS. C. T. GRAY opposed the change that would permit multi-unit apartments as they are not popular with the tenants or the neighbors. MRS. LEON DONN believed the off-street parking requirements would be inadequate in this area, and suggested that 2½ parking spaces should be required. She inquired if easements would be required from those properties on which apartments would be made to widen the street to provide for parking. She asked that the zoning of the area be postponed until after the zoning study now under way is completed. MR. LEO HUGHES asked the Planners of Austin to have more vision, and to keep Austin the unique city that it is by intelligent planning. MR. PENN filed a petition signed by 90% of the property owners, protesting the change, and stating this was a general petition showing the wishes of the people. MRS. CLICK, 3202 West Avenue, opposed the change; also Mr. C. T. Johnson, who asked a five year waiting period before the change was granted. Opposition was added by MRS. A. W. PENN and J. L. WALL. MRS. JOHN BARROW spoke regarding the Planning Commission's recommendation and regarding the Austin Development Plan as defined by Mr. Leo Hughes. Mrs.

Barrow represented the Friends Meeting of Austin, and stated the zoning to limited apartments would not affect this organization, and stated this apartment development would cover a five to fifteen year period.

"MR. RICHARD BAKER, representing MR. LINDEN JONES in his application at 3113–3117 West Avenue and 709–715 West 32nd, stated Mr. Jones would construct 16 apartment units on this property, and the plans showed from two to three off-street parking spaces per unit. This application had been filed eight months ago, and considerable study had been made, and the 'BB' zoning complies with the requirements of the Master Plan, streets, utilities, uses and density. He stated this area was changing. Mrs. Donn opposed this individual application, and asked that action on this be postponed also. The Director of Planning, pointed out most of the tracts of land in the area were small, and it would be hard for one to acquire enough tracts on which to build a 50 unit apartment, and the type of apartment development would be of small scale. Mayor Palmer pointed out the advantages of these area studies. After discussion, Councilman Shanks moved that the change to 'BB' Residence be granted, as recommended by the Planning Commission. The motion, seconded by Councilman White, carried by the following vote:

"Ayes: Councilmen Perry, Shanks, White, Mayor Palmer

"Noes: Councilman Armstrong"

An ordinance in conformance with that adopted by the council was enacted with provisions as to regulations.

The record in this case is long, but the material facts are not in dispute except as to the character of the lots and the area or district in which the lots are situated.

We are inserting herein a map of the area from 24th Street on the south to 29th Street on the north, North Lamar on the west and Guadalupe on the east.

The area or neighborhood claimed to be affected by the zoning extends from 28th Street on the south and to West 29th Street on the north and bounded by North Lamar on the west and by an alley on the east with some commercial or non-residence property within the area extending to Nueces Street.

The chief complaint and we believe the controlling issue in this appeal is that of "Spot Zoning."

As is to be seen by the map there is no dispute as to the physical facts as to width of streets, presence or absence of sidewalks, but the characteristics of the neighborhood, the need for additional apartments, the effect of the construction of an apartment building on the property is the subject of much testimony.

■ Any fact issue should be resolved in support of the judgment. Renfro Drug Company v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114.

■ A zoning ordinance is an exercise of the legislative power of the City Council and is presumed to be valid. City of Bellaire v. Lampkin, 159 Tex. 141, 317 S.W.2d 43, 66 A.L.R.2d 1289.

■ An amendatory zoning ordinance is presumed to be valid. City of Waxahachie v. Watkins, 154 Tex. 206, 275 S.W.2d 477.

■ There is an extraordinary burden of proof imposed on those attacking a zoning ordinance.

In the Waxahachie case the Supreme Court stated:

"The courts cannot interfere unless it appears that the ordinance represents a *clear abuse* of municipal discretion. And the 'extraordinary burden' rests on one attacking the ordinance 'to show that no *conclusive,* or *even controversial* or issuable, facts or conditions existed which would authorize the governing board of the municipality to

exercise the discretion confided to it.'" (Emphasis not ours.)

■ The authority of the courts in interfering with a municipal zoning ordinance is very limited. The proper test to be applied is whether reasonable minds may differ.

"If reasonable minds may differ as to whether or not a particular zoning restriction has a substantial relationship to the public health, safety, morals or general welfare, no clear abuse of discretion is shown and the restriction must stand as a valid exercise of the city's police power. City of Corpus Christi v. Jones, Tex.Civ.App., 144 S.W.2d 388, error dism., correct judgt. Otherwise expressed by the court in the case just cited, if the issue of validity is fairly debatable courts will not interfere." Waxahachie v. Watkins, supra.

■ The facts or particular circumstances are of extreme importance.

" * * * the controlling considerations are seldom if ever, the same in any two cases. Hence final determination of the validity of the ordinance must turn on the circumstances of each case and the character of the regulations involved. See Annotation in 149 A.L.R., pp. 292, 293." Waxahachie v. Watkins, supra.

By referring to the map it is apparent that the "area", "neighborhood" or district is surrounded by non-residential developments.

The area immediately adajacent called "A" Residence District consists of approximately 25 lots and is bounded on the south by West 28th Street, on the west by San Pedro Street, on the north by West 28½ Street and on the east by Rio Grande Street. There are, of course, other lots adjacent to the above area.

As we have said there was much testimony by witnesses for appellants and appellees as to the nature of the area, distances

from the University and need for apartment housing. Testimony was given as to the development of the area as a whole and that there had been no new residences built in many years. Among those testifying were Hoyle Osborne, City Director of Planning, who considered the change to be spot zoning and recommended that the change be disapproved by the Council and specifically testified as follows:

"Q. Now, in the terminology of the planning profession, what is meant by the term 'spot zone.?'

"A. Spot zone covers the following areas generally: One, that it be a departure from a comprehensive or general zoning plan for the community. Secondly, that it may be for a relatively small area generally surrounded by another larger area of a different zone. Third, that it might possibly confer either a special benefit to the particular individual owner or piece of property, or it might incur or impose certain specialized restrictions as opposed to that of the surrounding area. Fourth, that it is not specifically for the public welfare and benefit, as opposed to possibly a specific private or individual interest. Fifth, that it tends to depart from the conditions that are usually set out in this case in the State enabling legislation and in the City of Austin Zoning Ordinance concerning such matters as traffic and the ability of streets to carry this traffic, the provision of off-street parking, the provision of utilities, the provision of municipal services, the other items that are listed within the State enabling legislation and in the Zoning Ordinance as to the intent and purpose of the Zoning Ordinance. And generally the spot zoning will contain several or virtually all of these

conditions in a rather marked sense, a noticeable sense.

"Q. State whether in your opinion as a planner the rezoning of the Wire property constituted spot zoning.

"A. Yes, it did."

Ross Jacobs, a civil engineer working exclusively in the municipal field, testified as follows:

"Q. Mr. Jacobs, I ask you the question again: In your opinion does rezoning of the Wire property to 'B' Second Height constitute spot zoning?

"A. In my opinion, it does not.

"Q. Why, sir?

"A. Because of its nearness to similar zoning on the south, which was existing at that time, just below 28th Street."

Marvin Springer, a witness for appellees, a city planner in Dallas, Texas, testified as follows:

"Q. All right, sir. Now, state in your opinion as an expert whether you believe the zoning of the Henry Wire property from 'A', First Height and Area, to 'B', Second Height and Area, is spot zoning.

"A. Taking into consideration the neighborhood area which we are concerned with here, the Land Use Plan which has been adopted by the City of Austin, the pattern of changes which have occurred over this period of time, which are generally consistent with that plan, I would not so consider this a spot zoning.

\*    \*    \*    \*    \*    \*

"Q. State whether or not in your opinion the zoning of the Henry Wire property is consistent with the

Land Use Plan attached to the Master Plan.

"A. I would so interpret it, yes, sir."

Appellants cite as controlling on the question of "Spot Zoning" the case of Weaver v. Ham, 149 Tex. 309, 232 S.W.2d 704, decided in 1950, five years before the case of Waxahachie v. Watkins, supra.

We do not believe that facts and circumstances in the Weaver v. Ham case are the same as in the instant case.

■ We believe that the Waxahachie v. Watkins case is controlling in our disposition of the instant case.

■ We do not attribute significance to the fact that Mayor Palmer, an employee of Mr. Drake, and who voted for the passage of the ordinance, constituted a legal disqualification of Mayor Palmer; and that the special exception to the allegations in plaintiffs' petition setting up the alleged legal disqualification of Mayor Palmer was properly sustained.

■ A zoning ordinance represents an exercise of the legislative power of the city governing body and is not subject to attack grounded on the motives of a council member. Town of Ascarate v. Villalobos, 148 Tex. 254, 223 S.W.2d 945; City of San Antonio v. Fetzer, Tex.Civ.App., 241 S.W. 1034, error refused.

Appellants have cited a number of cases, some out of state and some in state cases in support of their position that Mayor Palmer was legally disqualified, such as Aldom v. Borough of Roseland, 42 N.J.Super. 495, 127 A.2d 190 (1956); State ex rel. La Crosse v. Averill, Tex.Civ.App., (1937) 110 S.W.2d 1173, writ refused; Moody v. City of University Park, Tex.Civ.App., 278 S.W. 2d 912, error refused, n. r. e.

We have not set out in any detail the testimony as to the nature and usage of the property, believing that there is no serious factual dispute, and that the maps offer a fair presentation, but do note that the last building permit for a single family dwelling to be constructed in the area was issued in 1951, about 11 years prior to the enactment of the zoning ordinance in question.

The judgment of the trial court is affirmed.

Affirmed.

## DISSENTING OPINION

The majority states that in this case, "The facts or particular circumstances are of extreme importance." I agree. The most significant fact in the record is that the three lots given special zoning classification by the Council are completely surrounded by lots which have the most restrictive classification in the City of Austin, "'A' Residence and First Height and Area." These lots and this area have been so restricted since the basic zoning ordinance was first enacted by the City in 1941.

Two of the three lots involved are vacant lots. There are five other vacant lots in this area, the zoning classification of which was not altered. In my opinion, the ordinance here attacked is a classic example of "spot zoning," and should be invalidated. I, therefore, respectfully dissent.

Some more of the undisputed facts will be recited:

The neighborhood is quiet, desirable, and distinctly residential. The homes are well improved and carefully maintained. Large elm trees and pecan trees in many places completely overhang the streets. The people who live there are for the most part connected with the University—either faculty (both active and retired) or graduate students. Many of the homeowners are University of Texas faculty members. Several of the residents testified that they purchased their homes recently because of the unusual residential desirability of the area.

San Pedro Street has a paving width of only 22 feet and a right of way of only 30

feet. The City of Austin presently requires new residential streets to have a right of way of at least 50 feet. In medium and high density areas, such as the ordinance in issue places subject property, the minimum right of way required is 60 feet. San Pedro Street, dedicated many years ago, actually grew out of what was once an alley. The result is that traffic on it is already very crowded. Today's cars average six feet, eight and one half inches wide. With cars parked on each side, there is left only a few inches of maneuvering space for a moving car. Cars parked on each side can block large vehicles such as fire trucks and garbage trucks.

One witness, Mr. Towery, an area homeowner, described the San Pedro traffic as follows:

"Q. Would you describe for us what you have observed about the traffic in the last year on San Pedro Street?

"A. It is very crowded; cars parked on both sides of the street, facing both directions. And on San Pedro twice I have nearly been hit broadside, at 28th and San Pedro.

"Mr. Towery, does the width of San Pedro have anything to do with the traffic problem you are talking about?

"Yes, it is not really a street. It is more of an alley, really; at least in size."

One of the City's own experts, civil engineer Mr. Ross Jacobs, described the Salado and San Pedro Streets as:

"Q. State in your opinion what is the character of the streets * * * of San Pedro Street.

"A. They are very narrow, winding, and of short direction.

"Q. Why is it, in your opinion, that they are classified as residential streets?

"A. Mainly because they don't go very far. They are very short streets.

They have numerous jobs and deadends, and there is no way that through traffic can actually move through the area."

A Second Height and Area classification had been denied to the previous owner of the subject property, E. M. Choate, Jr.

In May, 1960, Choate applied for change of the same tract's Height and Area Classification from First to Second. This was opposed by the neighbors. The Planning Commission recommended that the change be denied. In June, 1960, the City Council unanimously denied the application. After this denial, Choate withdrew his earlier (1957) application for a change of the tract from "A" to "B" Residence District, without change of Height and Area Classification which had been recommended by the Planning Commission. This application had been pending before the City Council from 1957 until its withdrawal in August, 1960, without any final action being taken on it by the Council.

Shortly before the passage of the ordinance in question, the City Council made a significant comprehensive area zoning change within two blocks of the Choate tract. On December 13, 1962, it rezoned the thirteen blocks immediately north of 29th Street. This zoning change was from "A" Residence to "BB" District which permits multiple apartment units. The creation of this district by the City Council was recommended by the Planning Commission. This district contains approximately 300 lots.

Prior to its recommendation, the Planning Commission, upon being referred an application for such a change by an individual covering several lots, instituted a study of the entire area. This study included consideration of street widths, number of people living in the area, estimates of the future population expected in Austin, and consideration of present use of the area. One of the factors of the Commission's recommendation was that creation of this thirteen block "BB" District would provide a large

area for future multiple apartment development.

This carefully studied and comprehensive zoning amendment was duly enacted by the City Council only six days before the filing of the application for the zoning change here in dispute. On December 19, 1962, an application to change the zoning of subject three lots from "A" Residence, First Height and Area, to "B" Residence, Second Height and Area, was filed.

The lots in suit consist of two vacant lots and one lot with a duplex on it. These lots had been owned for a number of years prior to the application by E. M. Choate, Jr. who signed the December 19, 1962, application.

The Choate application was duly referred to the Zoning Committee of the Planning Commission. Pursuant to the requirements of Article 1011c, V.A.C.S., all homeowners within 200 feet of the subject lots were notified of the hearing. A considerable number of the owners appeared in protest against the application. After a public hearing held on January 8, 1963, the Zoning Committee recommended against granting the application, stating to the Planning Commission:

"The Committee felt that the request should be denied as it would be a spot zone, and to grant it would create too high an increase in traffic. The streets could not handle any additional traffic."

At their meeting on January 15, 1963, the Planning Commission of the City of Austin recommended that the City Council deny the Choate application. Their minutes pointed out:

"A majority of the Commission felt that the request should be denied as it would be a spot zone and to grant it would create too high an increase in traffic. The streets could not be widened and could not handle any additional traffic. Some members felt that this would be the proper use for the area, once the streets are made adequate."

The Austin City Council voted on the Choate application on February 7, 1963. To override the Planning Commission recommendation of disapproval, an affirmative vote of at least four of the five members of the City Council was required by Section 31(b) of Chapter 32 of the City Code. The Council overrode the Planning Commission and granted the application by a vote of four to one.

Soon after the Council vote in favor of the zoning change, on April 1, 1963, Henry Wire, then record title owner of the three lots, applied for a building permit which was granted. The permit is for the construction of a two-story, 36-unit apartment hotel. The zoning change allows Wire to raise this to a maximum of 41-units on subject lots. The "B" Residence, Second Height and Area zoning permits an apartment hotel in which may be located a cafe, drug store, clothes pressing shop, and barber shop. The apartment house will accommodate 72 boys who are undergraduates at the University of Texas and will not have the supervision required by the University for "approved" housing. Wire testified that he did not intend to comply with the University requirements for approved housing.

To operate "approved" housing increases the overhead operational expense in that the owner is required to have a "house mother" on duty and graduate student supervisors. Wire admitted that he did not intend to incur this expense.

The City's survey of car ownership of apartment dwellers shows that one and one half cars per unit, or 54 cars, will be based at the apartment house. In addition, there will be visiting or guest cars. While the location of this apartment hotel will hardly be noticeable in the traffic of the major thoroughfares of Austin, it will have a drastic effect on traffic in San Pedro and Salado Streets. The apartment hotel will generate a minimum of from 180 to 400 car movements per day and it could be many more. There are no sidewalks along San

Pedro Street. The additional traffic generated will be hazardous to the children of the neighborhood. Children walking to school must walk in the street.

The construction of the apartment house would materially increase the likelihood of fire in the area.

Further parking on San Pedro Street would block its use for fire-fighting equipment and greatly handicap fire-fighting in the area. The Austin Fire Chief, R. H. Dickerson, testified:

"Q. As an expert in this matter, Chief, would you say that for San Pedro Street, assuming a twenty-five foot pavement, as you saw it there, to have a traffic condition that would bring about a parking on both sides of the street, would that be a definite fire hazard in your judgment?

"A. Well, if you had parking on both sides of the street, a twenty-two foot street from curb to curb, if they were not parked perfectly up against the curb, and part of them thrown out as you usually find, it would definitely block our entrance into a street of that width, yes, sir."

Also, the Fire Chief testified:

"Q. Now, if that house caught fire and this street was blocked by parked cars, would that be a major handicap in fighting a fire in Dr. Burford's house?

"A. Yes, sir. Traffic congestion wherever we go is a hazard to our efficiency. If we can't get through, we can't lay our lines; if we can't; we can't.

"Q. If you had this street blocked to your equipment by parked cars, would you be able to fight that fire?

"A. Well, there again, it would be like a house built on a hill with no entrance to it. You'd have to put a hose down as close to it as you could, and wherever it was blocked, pull it up the street to the fire, and that's a delay.

"Q. And the house might burn down in the meantime?

"A. It's according to how far advance it is. It isn't going to help conditions any."

Considerable noise will be generated by the imposition of seventy two unsupervised male undergraduates upon the neighborhood.

The City has not acquired the additional right of way necessary to widen either San Pedro or all of Salado Street in the area and has no plan to do anything about it. Although Wire donated a ten-foot strip on Salado, an additional strip must be acquired from the Owsley property next to Wire to the south. This has not been done. If this ten-foot strip is taken for Salado Street, the large trees in front of the property must be cut down. Henry Wire does not plan to make any effort to get San Pedro Street widened.

Yet to widen the right of way of San Pedro would destroy the front yards of several homes, and to widen either San Pedro or Salado would require cutting of many of the stately pecan and elm trees which have been there more than 40 years.

The City Council refused a request that action on the ordinance be withheld until proposed traffic and zoning studies of the area were made.

The City of Austin Master Plan, adopted in 1961, designates the section of the City in which subject property is located as High Density Residential. This designation calls for an average of fifteen dwelling units per acre over an extensive area. The zoning change given to the Wire property allows over twice the number of units per acre provided in the Master Plan.

In general, putting an apartment hotel in this location will completely change the character of the neighborhood.

Austin has approximately 1,000 acres within its city limits which were already zoned for multi-unit apartment use. Of this 1,000 acres, only about 330 acres is presently being used for multi-unit apartments. Thus only one third of the presently zoned apartment area is being devoted to such use at the present time. The recently zoned thirteen block area, a large and as yet undeveloped district for multi-unit apartments located right north of 29th Street, is available for this type of development—as well as a large area (already zoned for apartment hotels but as yet undeveloped) of land lying between this neighborhood and the University.

The view of the Zoning Committee of the Planning Commission and of the Planning Commission of the City of Austin that ordinance in suit constitutes spot zoning is supported by eminent authorities.

Yokley, Zoning Law and Practice, 2nd Ed., defines "spot zoning" as follows:

\   "Cases become 'spot zoning' where obviously a particularly small lot or parcel of ground is singled out and placed in an area, the use of which is unconsistent with the small lot or area so placed and whose classification is changed in the ordinance, and in these cases where special benefits are sought to be conferred on a particular property owner, or special burdens are sought to be imposed upon particular property owners."

In 101 C.J.S. Zoning § 34. this definition is given:

"Spot zoning is an attempt to wrench a single lot from its environment and give it a new rating that disturbs the tenor of the neighborhood, and which effects only the use of a particular piece of property or a small group of adjoining properties and is not related to the general plan for the community as a whole, but is primarily for the

private interest of the owner of the property so zoned; and it is the very antithesis of planned zoning."

Yokley, in referring to "spot zoning" calls it, " * * * a most vicious practice that has expanded almost to a point where it has become a cancerous growth on the body politic in many, many municipalities of the land. * * *"

In my opinion, this case is controlled by the decision in Weaver v. Ham, 149 Tex. 309, 232 S.W.2d 704. In that case the Court condemned as "spot zoning" an amending ordinance which created a Zone D (apartment house) island in the center of a Zone A (residential) district.[1] In the course of its opinion the Court held:

"The power to vary conditions of zoning ordinances should be sparingly exercised, and such power should be exercised only for the benefit of the public and with due regard for the preservation of the rights of others acquired under original zoning ordinances."

The Court also quoted approvingly this excerpt from the opinion of the United States Supreme Court in Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016, as follows:

" * * * 'With particular reference to apartment houses, it is pointed out that the development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by their height and bulk with the free circula-

1.  The "island" in the Ham case contained 220,000 square feet. The "island" in

this case is only 32,000 square feet, or about ⅐th the size of the Ham island.

tion of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accompaniments, the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities,—until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circumstances, apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances.' "

I insert below a photograph of a scene on Salado Street a short distance from the Wire apartment project.

The exercise of little imagination is required to envision the change upon this peaceful, beautiful and dignified neighborhood which will be wrought by the advent of seventy two unchaperoned University boys, their friends and carriages.

I would strike down the ordinance in suit and brand it a horrible example of discriminatory legislation.