BOARD OF APPEALS OF HANOVER *vs.* HOUSING APPEALS
COMMITTEE IN THE DEPARTMENT OF COMMUNITY
AFFAIRS & others.

BOARD OF APPEALS OF CONCORD *vs.* HOUSING APPEALS
COMMITTEE IN THE DEPARTMENT OF COMMUNITY
AFFAIRS & another.

Plymouth.   Suffolk.   December 8, 1972. — March 22, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY,
& KAPLAN, JJ.

*Housing. Zoning*, Low and moderate income housing, Housing Ap-
peals Committee, "Home rule," Spot zoning.   *Constitutional Law*,
Housing, Municipalites, Zoning, "Home Rule Amendment," Dele-
gation of powers, Equal protection of laws.   *Municipal Corpora-
tions*, Relation to Commonwealth, "Home rule."   *Statute*, Con-
struction.   *Equity Jurisdiction*, Judicial review under State Ad-
ministrative Procedure Act, Review of decision of Housing Appeals
Committee.   *Words*, "Requirements and regulation," "Independent
municipal power," "Consistent with local needs," "Uneconomic,"
"Reasonable," "Low and moderate income housing," "Substantial
evidence," "Limited dividend organization."

The history of St. 1969, c. 774, examined, and the conclusion reached
that the Legislature's intent was to provide relief from exclusion-
ary zoning practices by cities and towns which prevented the
construction of badly needed low or moderate income housing.
[346–354]
G. L. c. 40B, §§ 20–23, confer on municipal boards of appeals and the
Housing Appeals Committee in the Department of Community
Affairs the power to override local "requirements and regula-
tions," including zoning ordinances or by-laws, which are not "con-
sistent with local needs," as defined by § 20, for low or moderate
income housing.   [354–355]
The zoning power is one of the independent municipal powers of
cities and towns included in the broad grant of powers to munici-
palities by § 6 of art. 89 of the Amendments to the Massachu-
setts Constitution to adopt ordinances or by-laws to protect the
public health, safety, and general welfare. [358–359]
The power reserved to the Legislature by § 8 of art. 89 of the Amend-
ments to the Massachusetts Constitution "to act in relation to
cities and towns" was validly exercised by St. 1969, c. 774, author-
izing municipal boards of appeals and the Housing Appeals Com-
mittee to override zoning ordinances and by-laws in connection
with the construction of low and moderate income housing.   [359–
360]

Board of Appeals of Hanover *v.* Housing Appeals Committee.

The exercise by municipal boards of appeals or the Housing Appeals Committee of the power bestowed by G. L. c. 40B, §§ 20–23, to override zoning ordinances or by-laws which hamper construction of low or moderate income housing "consistent with local needs," subject to judicial review to insure that decisions will serve the public interest, would not constitute spot zoning. [360–363]

Construing as a whole §§ 20–23 of c. 40B of the General Laws, the standards to be applied by municipal boards of appeals in deciding whether to issue comprehensive permits for the construction of low or moderate income housing are the same as those to be applied by the Housing Appeals Committee upon appeal from the boards' decisions; it is irrelevant that § 20 and § 23 set forth the standards and that § 21 deals expressly with the hearing before the boards. [364–365]

There was no merit in contentions of impermissible vagueness and of unlawful delegation of legislative authority with respect to the standards set forth in § 20 and § 23 of c. 40B of the General Laws to be applied by municipal boards of appeals in deciding whether to issue comprehensive permits for the construction of low or moderate income housing, and to be applied by the Housing Appeals Committee upon a review of the board's decisions. [363–368]

Discussion of the varying effects of whether a municipality has met or has not met its minimum housing obligations as specifically defined in G. L. c. 40B, § 20, with respect to any need for low or moderate income housing, on the duty of its board of appeals on an application for a comprehensive permit to construct such housing. [365–367]

A housing authority proposing to operate a low or moderate income housing project constructed by a private developer is a proper applicant under G. L. c. 40B, § 21, for a comprehensive permit from the municipal board of appeals. [368, n. 20]

G. L. c. 40B, §§ 20–23 clearly requires a de novo hearing before the Housing Appeals Committee in the Department of Community Affairs following a denial by a municipal board of appeals of an application for a comprehensive permit to construct low or moderate income housing, or a grant of such an application "with such conditions and requirements as to make the building or operation of such housing uneconomic" and an appeal to the committee by the applicant for a "review" of the board's decision. [368–371]

There are no substantial differences between a review by a court of a decision of a municipal board of appeals to grant a comprehensive permit for the construction of low or moderate income housing, upon an appeal under G. L. c. 40B, § 21, and c. 40A, § 21, by a person aggrieved, and a review by the Housing Appeals Committee of a board's denial of such a permit or a grant thereof with conditions and requirements, upon an appeal under c. 40B, § 22, by the applicant; the constitutional guarantee of the equal protection of the laws is not involved. [371]

Upon a finding by the Housing Appeals Committee under G. L. c. 40B, § 23, that a decision of a municipal board of appeals on an application for a comprehensive permit to construct low or moderate income housing is incorrect, it is incumbent on the committee to carry out the procedure indicated in § 23, not to remand the case to the board. [372]

Under G. L. c. 40B, § 23, the Housing Appeals Committee has the power to order a municipal board of appeals, which under § 21 may issue a comprehensive permit for the construction of low or moderate income housing on conditions, to order the board to issue such a permit on conditions. [372–374]

The Housing Appeals Committee did not exceed its authority by imposing, as conditions on which the board of appeals of a town would grant a comprehensive permit for the construction of low or moderate income housing, requirements that "appropriate state authorities" should approve the proposed drainage and sewage disposal, and that a certification by "the Department of Community Affairs" would be adequate proof of sufficient disclosure of the landowners' leasing arrangement to the applicant [372, 373, 375]; and it was within the committee's discretion to refuse to set final dates for the completion of the project [375].

The record in a suit in equity supported a decision by the Housing Appeals Committee that the denial by the board of appeals of a town of an application under G. L. c. 40B, §§ 20–23, for a comprehensive permit to construct low and moderate income housing was unreasonable and not consistent with local needs, where there was substantial evidence that the town had not met its minimum housing obligations [376–377]; that the applicant, to which the site of the proposed housing was leased, had sufficient property interest in the site to qualify as an applicant [377–378]; that the applicant was a "limited dividend . . . organization" and so entitled to submit an application [378–380]; that the applicant was eligible to receive appropriate funding from a State or Federal agency and was "proposing to build low or moderate income housing" [380]; that the applicant's plans with respect to health, safety, traffic flow, parking facilities, and landscaping were adequate [380–381]; and that the board had unreasonably rejected the applicant's original plans [381].

A stipulation by the parties to a proceeding before the Housing Appeals Committee under G. L. c. 40B, §§ 20–23, that there was both a need in a certain region for low or moderate income housing and a need for such housing in a town within that region, provided adequate support for the committee's conclusion that the town had not met its minimum housing obligation as defined by § 20. [382]

Substantial evidence before the Housing Appeals Committee upon a proceeding under G. L. c. 40B, §§ 20–23, warranted its conclusion that the plans for a proposed low and moderate income housing project in a town were adequate with respect to solution of a water problem in the area. [382–383]

The Legislature used its own zoning power, in enacting §§ 20–23 of c. 40B of the General Laws, to ensure that "strictly local interests" of a city or town should yield to a regional need for the construction of low and moderate income housing; the administrative mechanism adopted, which is designed, when necessary, to supersede local restrictive requirements and regulations, is constitutional. [383–385]

BILL IN EQUITY by the Board of Appeals of Hanover filed in the Superior Court on August 6, 1971.

The suit was reserved and reported by *Taveira,* J.

BILL IN EQUITY by the Board of Appeals of Concord filed in the Superior Court on December 17, 1971.

The suit was reserved and reported by *Kalus,* J.

*William J. Flynn, Jr.,* for the Board of Appeals of Hanover.

*Eric Verrill (William F. Frado, Jr.,* with him) for the Board of Appeals of Concord.

*Robert J. Condlin,* Assistant Attorney General, for the Housing Appeals Committee in the Department of Community Affairs.

*Thomas J. Kelly* for Country Village Corporation & others.

*John H. Clymer* for Concord Home Owning Corporation, intervener.

*Alexander J. Cella & Robert Cohen* for Newton Civic and Land Association & another, amici curiae, submitted a brief.

TAURO, C.J.   These are two suits in equity brought by (1) the board of appeals of the town of Hanover (Hanover board) and (2) the board of appeals of the town of Concord (Concord board) each reserved and reported by a Superior Court judge without decision.   We have before us the records of the proceedings before both boards and the Housing Appeals Committee (committee) as certified by the committee.   The boards denied applications for comprehensive permits to build low and moderate income housing filed pursuant to the provisions of G. L. c. 40B, §§ 20 and 21, and the applicants appealed to the committee pursuant to G. L. c. 40B, § 22.   The committee rendered two decisions, in each case reversing the board and ordering the issuance of the permit.   The suits, brought under G. L. c. 40B, § 22, and G. L. c. 30A, § 14, seek review of the committee's decisions.   The cases were argued together.   The bills present similar questions concerning the constitutional validity and the substantive and procedural effects of G. L. c. 40B, §§ 20–23,

inserted by St. 1969, c. 774, § 1 (c. 774). The cases are, therefore, decided together.


## *The Hanover Proceedings.*

In April, 1970, Country Village Corporation filed an application with the Hanover board for a comprehensive permit to construct eighty-eight units of low and moderate income housing for the elderly on approximately ten acres of land. After holding public hearings on the application, as required by G. L. c. 40B, § 21, and G. L. c. 40A, § 17, the board refused to issue the permit. The board then filed with the clerk of the town of Hanover its decision denying the permit and the reasons for the denial.[1] In December, 1970, the applicant appealed to the committee. G. L. c. 40B, § 22. The committee, after holding public hearings on the appeal pursuant to G. L. c. 40B, §§ 22 and 23, vacated the decision of the board in July, 1971, and ordered the board to issue a comprehensive permit for the project, subject to specified conditions.[2] The Hanover board then filed this bill for review in the Superior Court.

---

[1] The reasons specified by the Hanover board for its denial of the permit were:

"1. The apparent conflict between chapter 774 of the Acts of 1969 and the zoning bylaws of the town of Hanover in regard to zoning districts and permissible uses in different zoning districts;

"2. The apparent conflict between chapters 774 of the Acts of 1969 and the zoning enabling act, G. L. c. 40A;

"3. The applicant does not own the site on which the proposed project is to be built;

"4. The applicant is not a limited-dividend corporation;

"5. The proposed project would increase traffic and would not be acceptable for the present road construction;

"6. The applicant failed to submit adequate drainage and sewerage plans to the appellant [Hanover board] and failed to file revised drainage and sewerage plans with the appellant incorporating changes recommended by the appellant;

"7. The applicant failed to submit to the appellant sewerage plans acceptable to the state department of public health or the Hanover board of health."

[2] See fn. 22, *infra.*

## The Concord Proceedings.

In January, 1971, the Concord Home Owning Corporation filed with the Concord board an application for a comprehensive permit to construct sixty garden apartment units of low and moderate income housing on approximately five and one-half acres of land. The board then held public hearings on the application as required by G. L. c. 40B, § 21, and G. L. c. 40A, § 17, and refused to isue the permit. The board filed with the clerk of the town of Concord its decision denying the permit and the reasons for the denial.[3] In April, 1971, the applicant appealed to the committee. G. L. c. 40B, § 22. After holding the required public hearing on the appeal, the committee vacated the decision of the board and ordered the board to issue the applicant a comprehensive permit for the project, subject to specified conditions.[4] The board then filed this bill for review in the Superior Court.

## Issues Presented.

The bills present three issues for resolution concerning the powers and procedures of the boards of appeals and the committee under G. L. c. 774. We must determine:

(a) whether c. 774 confers power upon both the committee and the boards to override zoning regulations which hamper the construction of low and moderate housing;

(b) whether such power to override zoning regulations, if it exists, is constitutional; and

---

[3] The reasons specified by the Concord board for its denial of the permit were: "(a) the construction of the project would be in violation of the Town of Concord Zoning By-Law, which violation the Board of Appeals was not empowered by G. L. c. 40B, §§ 20 and 21 to authorize, and (b) the denial of the application for a comprehensive permit for the project was 'reasonable and consistent with local needs,' as required by the provisions of G. L. c. 40B, § 23, in that the project could be detrimental to the health and safety of the future occupants of the project and the residents of the Town in the vicinity of the project because of the severe subsurface water conditions affecting the area of the project."

[4] See fn. 22, *infra.*

(c) whether such power to override zoning regulations, if it exists, was properly exercised by the committee in the instant cases.

Chapter 774[5] permits a qualified applicant[6] interested in building low or moderate income housing to file with a board of appeals an application for a comprehensive permit instead of filing separate applications with each local agency or official having jurisdiction over various aspects of the proposed project. The statute allows the board of appeals to grant a single comprehensive permit for construction after considering the recommendations of the local agencies or officials. General Laws c. 40B, § 21, establishes a specific time period within which the board of appeals must make its decision. If the board makes no decision within this period, "the application shall be deemed to have been allowed and the comprehensive permit or approval shall forthwith issue." § 21. If the board issues a comprehensive permit, any person aggrieved by its decision may appeal to the District or Superior Court as provided in § 21 of G. L. c. 40A.

Whenever the board of appeals denies an application or grants it with conditions which make the building or operation of the proposed housing project "uneconomic," [7] § 22 grants the applicant a right of appeal to the committee. The committee is required to conduct a full hearing with a stenographic record within twenty days of the receipt of the applicant's appeal and it must

[5] Chapter 774, §§ 1 and 2, inserted §§ 20–23 of G. L. c. 40B and § 5A of c. 23B.

[6] General Laws c. 40B, § 20, limits the class of proper applicants under c. 774 to public agencies, nonprofit organizations, and limited dividend organizations. See fn. 17, *infra.*

[7] General Laws c. 40B, § 20, defines "uneconomic" as "any condition brought about by any single factor or combination of factors to the extent that it makes it impossible for a public agency or nonprofit organization to proceed in building or operating low or moderate income housing without financial loss, or for a limited dividend organization to proceed and still realize a reasonable return in building or operating such housing within the limitations set by the subsidizing agency of government on the size or character of the development or on the amount or nature of the subsidy or on the tenants, rentals and income permissible, and without substantially changing the rent levels and units sizes proposed by the public, nonprofit or limited dividend organizations."

render a written decision "stating its findings of fact, its conclusions and the reasons therefor within thirty days after the termination of the hearing, unless such time shall have been extended by mutual agreement between the committee and the applicant." Section 23 limits the committee's review to determining whether the board of appeals' decision to deny the application was "reasonable and consistent with local needs" [8] as defined by § 20. If the board grants the application subject to conditions, § 23 limits the committee's review to determining whether the conditions make the construction or operation of the housing uneconomic and whether the conditions are consistent with local needs. If the board's decision to deny the permit or to impose uneconomic conditions on its approval is found to be consistent with local needs, the committee must affirm the board's decision. "If the committee finds, in the case of a denial, that the decision of the board of appeals was unreasonable and not consistent with local needs, it shall vacate such decision and shall direct the board to issue a comprehensive permit or approval to the applicant." § 23. If the committee finds that the conditions imposed by the board in approving the application make the building or operation of the housing "uneconomic" and that the board's decision is not consistent with local needs, the committee "shall order such board to modify or remove any such condition or requirement so as to make the proposal no longer uneconomic and to issue any necessary permit or approval." The committee's decision is subject to judicial review in accordance with c. 30A's provisions. G. L. c. 40B, § 22.

1. *Does c. 774 Confer upon both the Committee and the Boards the Power to Override Local Zoning Regulations to the Extent that such Regulations Conflict with the Implementation of c. 774?*

The boards argue that the Legislature did not intend

[8] See *infra* for a detailed discussion of the definition of these standards.

to grant the power to override local zoning by-laws or ordinances to any authority when it enacted c. 774. Thus, their respective decisions to deny comprehensive permits in these cases were reasonable and consistent with local needs because neither they nor the committee had authority to issue comprehensive permits for a use of land not permitted under local zoning by-laws. The boards contend that the Legislature's purpose in enacting c. 774 was merely to provide a streamlined procedure for processing applications for the necessary local approvals of construction of low or moderate income housing. Where previously an applicant was forced to negotiate with various local agencies or officials before gaining their approval, c. 774's new time limits expedited the process by allowing the applicant to apply for and obtain a comprehensive permit from a single agency, the board of appeals. The committee argues, to the contrary, that the text, history, and context of c. 774 indicate that the Legislature intended to confer to both the board and the committee the power to override any local requirements and regulations, including zoning by-laws, which prevented the construction of low and moderate income housing when such housing is deemed "consistent with local needs."

To resolve this controversy over c. 774's essential purpose, we must examine its detailed legislative history to determine the nature of the problem that the statute was designed to remedy. The boards' interpretation of the statute rests on their argument that the Legislature was chiefly concerned with speeding up the processing of applications for the construction of low and moderate income housing. However, the legislative history of c. 774 indicates that the Legislature was more concerned with the cities' and towns' possible use of their zoning powers to exclude low and moderate income groups.

The legislative history of c. 774 begins with a 1967 Senate Order, No. 933, which directed the Legislative Research Council (Council) to "undertake a study and investigation relative to the feasibility and implications

of restricting the zoning power to cities and county governments with particular emphasis on the possibility that the smaller communities are utilizing the zoning power in an unjust manner with respect to minority groups."

The Council's report focused on the economic discrimination which resulted from restrictive local zoning practices. "The Research Bureau was unable to uncover any recent comprehensive studies concerning possible 'anti-minority' uses of local zoning in Massachusetts, especially in an ethnic or religious minority sense. . . . Most complaints received by the Research Bureau were directed, instead, against alleged 'economic discrimination' in local zoning which reportedly impairs the effort of low and modest income people of all racial and religious origins to find homes within their financial means. Hence, this Council report emphasizes that aspect of zoning discrimination in Massachusetts. . . ." Report of the Legislative Research Council relative to Restricting the Zoning Power to City and County Governments (the Report), 1968 Senate No. 1133, p. 28.

Since the Council received information concerning the zoning practices of 113 of the Commonwealth's 351 municipalities, its report represents a well researched statement of the unavailability of low and moderate income housing in suburban Massachusetts communities and the reasons for the shortage. The Report examined the effects of local restrictive zoning practices (i.e. minimum lot size requirements, green space zoning, minimum frontage and setback requirements, minimum floor area requirements, maximum building areas of lots, building height limitations, inspection and permit fees), and indicated that "[t]he interplay of these municipal regulations determines, in substantial degree, the extent to which additional modest income housing is possible in relation to the local supply of 'buildable' land." P. 91.

What follows is a summary of the Report's conclusions:

(1) Large lot requirements (minimum lot size) have a substantial negative effect on the availability of land

in the suburbs which could be used for low and moderate income housing. P. 102. The Report listed twenty-one municipalities, including Hanover, that restricted 50% or more of their territory to large lot zoning. P. 98.

(2) Building height limitations were also found to have a significant negative impact on low and moderate income housing. The Report noted that forty-six municipalities had height limitations and thirty-one, including Hanover, forbade apartment buildings altogether. The Report concluded, "Beyond these height restrictions . . . lies the greater public policy issue of providing sufficient sites in metropolitan areas for adequate multi-family and apartment housing at modest rentals for that portion of the area population which cannot afford to own or to rent a single-family home . . .. To the extent that inner suburban communities prohibit multi-family and apartment housing, or attach height or other restrictions which make such housing feasible only on a 'luxury' basis, the modest income housing problems of the entire metropolitan area are aggravated." *Id.* at 118.

After determining that seven of the eight local restrictive zoning practices studied had a negative impact on the construction of low and moderate income housing, the Report noted that the housing shortage problem had reached crisis proportions. In 1947, the entire State population could be housed in buildings on land as then zoned. Pp. 32–33. But by 1968, low income persons could not find places to live in the suburbs at prices which they could afford to pay. *Id.* at 87–88. One study estimated that by 1968, 20,000 additional housing units would be needed to accommodate low income families (*id.* at 121; Massachusetts Special Commisison on Low-Income Housing, Final Report, 1965 House No. 4040, at 82–83), and that 125,000 new housing units would be needed to meet population increases alone by 1975. Report at 88.

The Report concluded with the dire prediction that if existing exclusionary zoning practices by municipalities were left unregulated, the supply of vacant land would

be eliminated by the 1990's (*id.* at 102) because the communities were not inclined to act on their own to alleviate the problem (*id.* at 123) and the courts were unwilling to intervene as long as the discrimination involved in the exclusionary zoning practices was economic.[9] The Council recommended a plan which would leave with cities and towns the general power to direct their own development but would permit, in appropriate cases, the circumvention of exclusionary zoning by-laws where their enforcement would frustrate the State's need for more low and moderate income housing.

The Council's Report prompted the submission of the following bills in the 1969 session of the Legislature: Senate Bills Nos. 1137 and 1141, and House Bills Nos. 2924, 3175 and 3603. All of these bills called for the imposition of State control over the suburbs' exercise of exclusionary zoning practices in order to insure the availability of low and moderate income housing throughout the State. In different ways and to different degrees, these bills provided for the overriding of local zoning ordinances and by-laws which frustrated the construction of low and moderate income housing in the suburbs.[10]

These five bills were referred to the Committee on Urban Affairs. In June of 1969 that committee reported

---

[9] See fn. 28, *infra,* for recent judicial treatment of exclusionary zoning laws.

[10] Senate Bill No. 1137 would have amended the Zoning Enabling Act, c. 40A, to provide "that no . . . [zoning] ordinance or by-law shall be valid which does not permit multi-unit residential buildings on at least fifteen per cent of the area of the city or town. Senate Bill No. 1141 called for the creation of a special housing district classification regulated by the State in each city or town with a low population density. House Bill No. 2924 called for an amendment of § 2 of c. 40A which would have invalidated any ordinance or by-law which prohibited or limited the use of land for any "single family or multi-family [housing] which is sponsored by a local housing authority, a non-profit or limited dividend corporation, a cooperative, or condominium for low- or moderate-income families." The bill further sought to amend § 10 of c. 40A by providing that the housing enumerated by the amendment of § 2 "may be exempted from the zoning ordinance or by-law if, upon petition of such authority . . . the department of community affairs shall, after public notice and hearing, decide that the present or proposed situation of the building . . . in question is reasonably necessary for promoting the welfare of the public, combatting poverty, or opening housing opportunities in the commonwealth."

out House Bill No. 5429 which, in modified form, became c. 774. The committee also sent a report to explain the bill's purpose and the problems it was designed to resolve. "The committee on urban affairs has found that there is an acute shortage of decent, safe, low and moderate cost housing throughout the commonwealth. . . . Unless land in less densely populated areas is available there will not be enough housing in any town or city for even the children of the present residents, municipal employees . . . . [N]ecessary land in such areas is often unavailable because of restrictive zoning controls or similar local regulations. Moreover, where land is available, the process of obtaining local approval is so protracted as to discourage all but the most determined and well-financed builders . . . ." Although the bill allowed local governments to implement its provisions initially, the Committee on Urban Affairs made it clear that cities and towns would not be allowed "to unreasonably obstruct the construction of a limited amount of adequate low cost housing."

The Concord board claims that the Council's Report, the bills submitted in response to it, and the final draft of House Bill No. 5429 which was reported out of the Urban Affairs Committee along with its report are "misleading indication[s] of the intent of the General Court." Although all of the prior legislative history of House Bill No. 5429 reflects a consistent attempt on the Legislature's part to resolve the housing shortage problem by establishing an effective means of circumventing the suburbs' exclusionary zoning provisions, the Concord board claims that this intended approach was eliminated when House Bill No. 5429 was redrafted by the Committee on Ways and Means.

However, a careful examination of the changes made by the Committee on Ways and Means reveals that the Concord board's argument rests on a relatively insignificant rephrasing of language which changed the form but not the substance of the bill. When the bill was reported out by the Committee on Urban Affairs, the sec-

tion concerning the committee's review of a local board of appeals' decision that imposed "uneconomic" conditions on the permit read, "the commission or the committee shall, unless the action of the board of appeals is found to be consistent with local needs, order such board to issue any necessary permit or approval or to modify or remove any requirement, *including but not limited to zoning or building code requirements*" (emphasis supplied). When the bill was reported out of the Committee on Ways and Means, 1969 House Bill No. 5381, the "including but not limited to" clause had been eliminated so the clause read "it [the committee] shall order such board to modify or remove any such condition or requirement . . . and to issue any necessary permit or approval . . .." The omission of the superfluous "including but not limited to" phrase which delineated only part but not all of the power granted by the clause which it modified did not negate the Legislature's primary intent to circumvent the suburbs' exclusionary zoning practices. The insignificance of this redrafting is further emphasized by the proviso following that section which establishes minimum construction safety standards for housing built under the statute. This provision would have been unnecessary if in all instances local regulations were to apply.

Examination of the subsequent legislative history of c. 774 as redrafted by the Committee on Ways and Means (renumbered House Bill No. 5581) discloses neither a change of purpose nor a change of method on the part of the Legislature.[11] The redrafted bill had the same title as the Urban Affairs Committee bill, "An Act providing for the construction of low or moderate income housing in cities and towns and for relief from local restrictions hampering such construction." Since the title to a statute may be considered in its construction, *Silverman* v.

[11] See Schneider, Innovation in State Legislation: The Massachusetts Suburban Zoning Act (unpublished paper available in Social Law Library, Boston), for a detailed analysis of c. 774's legislative history (Innovation).

*Wedge,* 339 Mass. 244, 245, the identical titles suggest that no major change of substance was intended by the redrafting of the Committee on Ways and Means.[12] Moreover, records of the legislative debate reveal that both proponents and opponents[13] of the redrafted bill realized that the bill would grant the power to override local zoning regulations which hampered the construction of low and moderate income housing. The House Journal indicates that opposition to the bill was based on the bill's incursion into the municipalities' power to exercise a veto over low and moderate income housing. In both the House and the Senate, opponents of the bill attempted unsuccessfuly to amend the bill in a way which would have stripped the legislation of its primary effect by excluding the bill's applicability to any city or town which refused to accept it. See 1969 House Journal, p. 2444, 1969 Senate Journal, p. 1912. Clearly, such an amendment would not have been necessary if local zoning powers were to remain inviolate under the new law because city councils and town meetings already had the power to prevent any nonconforming use.

In view of the descriptions of the redrafted bill's effect by the legislators themselves, and considering the failure of these amendments, both in the House and Senate, which would have given local communities a veto over application of the statute to their municipality, we conclude that the Legislature's intent in passing c. 774 was

---

[12] When the bill came before the Senate for the final vote, the title had been redrafted to read, "An Act providing for the construction of low or moderate income housing in cities and towns in which local restrictions hamper such construction." 1969 Senate Journal, p. 1965.

[13] Representative Robert Aronson noted in debate that the bill "will do away with local zoning. The Legislature has no right to step in. It is the first step to state controlled zoning." State House News Service, July 31, 1969, p. 2.

After the bill had been passed by the House, State Senator John J. Moakley noted in a press release, "Restrictive zoning has been and continues to be the prime impediment to the building of low and moderate income housing in our neighborhoods and contiguous suburbs. . . . The bill establishes criteria for judging when low or moderate income housing should be released from local zoning codes." Innovation, *supra,* p. 92, fn. 42.

to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing.

Our determination of the Legislature's intent enables us to interpret the text of the statute which admittedly is not without its ambiguities. The statute must be construed in a manner that effectuates its intent. With this in mind, we turn to the ambiguities in the statute's text noted by the boards.

The boards claim that the statute's failure to refer specifically to local zoning ordinances or by-laws indicates that no power to override them was in fact conferred. However, c. 40B, § 20, in delineating when a board's decision is consistent with local needs, refers to "requirements and regulations." Though this reference is somewhat ambiguous, the Legislature's clear purpose in passing this statute requires our construction of this term to include local zoning by-laws and ordinances. Although the word "zoning" is not specifically used, the statute's legislative history and avowed purpose to facilitate the construction of low and moderate income housing in areas which have exclusionary zoning practices compel our decision to construe the statute so that zoning ordinances or by-laws are treated like any other local requirements which hamper the construction of low and moderate income housing. All these local "requirements and regulations" will be applicable if they are "consistent with local needs"; if they are not, they must be modified or ignored.

Our decision that the committee has the authority to override local requirements and regulations that are inconsistent with local needs by implication necessitates a construction of the statute which confers this same authority upon the boards. As the Concord board noted, "if anyone has the power to override zoning ordinances or by-laws under G. L. c. 40B, §§ 20–23, then both the Committee and all local boards of appeals have that power. If the result were otherwise, it is obvious that in any case where a proposed project is not permitted by a zoning by-law, the applicant must follow the futile proce-

dure of applying for relief before a forum which has no power to grant the relief being sought." Since we must avoid a construction of statutory language which produces irrational results (*Johnson* v. *Commissioner of Pub. Safety*, 355 Mass. 94, 99), that portion of § 21 which states that the "board of appeals . . . *shall have the same power* to issue permits or approvals as any local board or official who would otherwise act with respect to such application . . ." (emphasis supplied) cannot be read to exclude the additional power to override local requirements and regulations granted by § 20 and § 23. Thus, we construe § 21 to confer upon boards "the same power . . . as any local board or official" in addition to that power otherwise conferred by the provisions of this act.

We have often stated that a construction of a statute which would completely negate legislative intent should be avoided. *Assessors of Newton* v. *Pickwick Ltd. Inc.* 351 Mass. 621, 625. The boards' interpretation of this statute would have exactly this effect. Streamlining local permit procedures could not possibly serve the statute's clear purpose of promoting the construction of low and moderate income housing if the cities and towns retained the unlimited power to enforce restrictive zoning ordinances or by-laws which prevented the construction of such housing. Therefore, we hold that c. 774 confers on boards of appeals and the Housing Appeals Committee the power to override local "requirements and regulations," including zoning ordinances or by-laws, which are not "consistent with local needs."

2. *Does c. 774 Violate the Home Rule Amendment?*

We must now determine whether the grant of such power is constitutional. There is no question that the Legislature could have conferred the power to override local zoning regulations prior to the adoption in 1966 of the Home Rule Amendment (art. 89). Prior to its amendment by art. 89, art. 2 of the Amendments gave to the Legislature the "full power and authority to erect and constitute municipal or city governments, in any

corporate town or towns in this commonwealth, and to grant to the inhabitants . . . such powers, privileges, and immunities, not repugnant to the constitution as the general court shall deem necessary or expedient for the regulation and government thereof . . . provided . . . that all by-laws made by such municipal or city government . . . [are] subject, at all times to be annulled by the general court." This article made the cities and towns creatures of the State, *Moore* v. *Election Commrs. of Cambridge,* 309 Mass. 303, 316–317, subject to the will of the Legislature. *Commonwealth* v. *Hudson,* 315 Mass. 335, 345.

Our interpretation of art. 2 coincided with the general principle (popularly known as Dillon's Rule) that municipal corporations possess "and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the accomplishment of the declared objects and purposes of the corporation . . .. Any fair, reasonable, substantial doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." Dillon, Municipal Corporations (5th ed.) § 237, pp. 449–450.

In light of this formulation of State and local relations, all municipal rights and powers were derived from their creator, the State. Since the municipalities had no inherent or independent rights, a doctrine soon developed in our case law that the State had absolute authority to remove any right or power it had originaly conferred upon a municipality. What the State gave, it could also take away because "the towns of the Commonwealth possess no inherent right to self-government." *Paddock* v. *Brookline,* 347 Mass. 230, 238.

Thus, this court has upheld repeatedly the Legislature's "supreme" power in zoning matters. *Bennett* v. *Board of Appeal of Cambridge,* 268 Mass. 419, 422. *Attorney Gen.* v. *Dover,* 327 Mass. 601, 604–605. The power to regulate in the first instance included within it the

more limited power to pass State laws which carved out exceptions to local zoning ordinances or by-laws. Therefore, in *Opinion of the Justices*, 341 Mass. 760, 788–789, we advised that proposed legislation which would authorize the Boston Redevelopment Authority to permit a redevelopment project that deviated from local zoning law would be constitutional. We said, "Article 60 of the Amendments provides that the Legislature 'shall have power to limit buildings according to their use or construction to specified districts of cities and towns.' 'The power of the General Court over the subject of zoning' has been said to be 'supreme' . . .. [Citations omitted.] This power, together with the broad legislative power to revise the governmental structures of cities and towns and the powers and duties of municipal bodies and boards, amply warrants delegating under appropriate standards to the Authority, subject to the approval of the mayor, the power to grant zoning deviations." If these decisions are still in effect, they would provide ample authority for upholding the Legislature's right to enact laws which carve out exceptions to local zoning by-laws and ordinances.

However, the amici curiae contend that the adoption of the Home Rule Amendment prevents the Legislature from interfering with the municipalities' exercise of their zoning powers and renders all of our pre-1966 zoning decisions which rely on the State's supreme zoning power inapplicable to the present controversy.

It is true that art. 89's adoption has "effected substantial changes in the legislative powers of the General Court and the cities and towns." *Opinion of the Justices*, 356 Mass. 775, 787. The significance of our pre-home rule decisions which rested *solely* on the premise that no municipality has any vested right in its form of government has been considerably diminished by art. 89's implicit repudiation of the Dillon Rule's characterization of city-State relations. See *Belin* v. *Secretary of the Commonwealth*, 362 Mass. 530, 535.

Section 6 of art. 89 establishes a broad general grant

of home rule powers to cities and towns. "Any city or town may, by the adoption, amendment, or repeal of local ordinances or by-laws, exercise any power or function which the general court has power to confer upon it, which is not inconsistent with the constitution or laws enacted by the general court in conformity with powers reserved to the general court by section eight, and which is not denied, either expressly or by clear implication, to the city or town by its charter." Section 7 of art. 89 then specifies certain exceptions to § 6's broad grant of home rule powers. Taken together, these two sections repudiate the conception that all powers lie in the State except those expressly delegated to cities and towns. The Home Rule Amendment grants cities and towns independent municipal powers which they did not previously inherently possess. Municipalities are now free to exercise any power or function, excepting those denied to them by their own charters or reserved to the State by § 7, which the Legislature has the power to confer on them, as long as the exercise of these powers is not inconsistent with the Constitution or laws enacted by the Legislature in accordance with § 8. See § 6 of art. 89 and § 13 of the Home Rule Procedures Act.[14]

Therefore, in order to resolve the question of whether the Legislature can enact a statute which overrides local zoning ordinances or by-laws, we must first consider the source of the municipalities' authority to adopt local zoning ordinances or by-laws in light of the material changes which were made in art. 2 by the adoption of the Home Rule Amendment. We must decide first whether the power to zone is one of the municipalities' independent powers conferred to them by § 6 or whether it constitutes a power expressly reserved to the Legislature by § 7.

Section 7 (5) provides that "[n]othing in this article shall be deemed to grant to any city or town the power . . . (5) to enact private or civil law governing civil relationships except as an incident to an exercise of an

---

[14] G. L. c. 43B, § 13 (inserted by St. 1966, c. 734, § 1).

independent municipal power." We construed the phrase "independent municipal power" in *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline,* 357 Mass. 709, 718. We said "[t]he quoted vague language points, in our opinion, to viewing separately the various component powers making up the broad police power, with the consequence that a municipal civil law regulating a civil relationship is permissible . . . only as an incident to the exercise of some independent, individual component of the municipal police power." Unlike the rent control ordinance which we struck down in the *Marshal House* case because of its direct effect upon civil relationships, any effect zoning ordinances or by-laws may have on civil relationships is incidental to the exercise of the town's independent police powers to control its land usages in an orderly, efficient, and safe manner to promote the public welfare. At the very least, the term "independent municipal power" is intended "as a validation of the inevitable impact of public regulation on private rights, as, for example, a zoning ordinance affects the use which a landowner may make of his property." Sandalow, The Limits of Municipal Power Under Home Rule: A Role for the Courts, 48 Minn. L. Rev. 643, 676. Therefore, we hold that the zoning power is one of a city's or town's independent municipal powers included in art. 89, § 6's broad grant of powers to adopt ordinances or by-laws for the protection of the public health, safety, and general welfare.

However, our holding that local zoning ordinances or by-laws flow from the municipalities' independent municipal powers does not mean that c. 774 unconstitutionally encroached upon home rule powers. "Plainly the Legislature, under art. 89, may forbid the enactment or control the form of such by-laws in some manner, without regard to whether such a by-law . . . comes within § 7 (5)." The *Marshal House* case, *supra,* at 717. Section 6's broad grant of home rule powers contains a provision which limits the exercise of these powers to acts "not inconsistent with the constitution or laws enacted by the

general court in conformity with powers reserved to the general court by section eight." Section 8 provides that "[t]he general court shall have the power to act in relation to cities and towns, but only by general laws which apply alike to all cities, . . . or to all cities and towns, or to a class of not fewer than two, and by special laws enacted . . .."

Thus, municipalities can pass zoning ordinances or by-laws as an exercise of their independent police powers but these powers cannot be exercised in a manner which frustrates the purpose or implementation of a general or special law enacted by the Legislature in accordance with § 8's provisions. The adoption of the Home Rule Amendment has not altered the Legislature's supreme power in zoning matters as long as the Legislature acts in accordance with § 8. Chapter 774 is a proper exercise of the powers reserved to the Legislature by § 8 because it is a general law which applies to two or more municipalities. It is in addition to the Legislature's continuing exercise of such reserve power in its numerous amendments to G. L. c. 40A, which is the basic enabling statute for zoning by-laws and ordinances. Therefore, the statute's grant of power to boards of appeals and to the committee to override local zoning ordinances or by-laws which would otherwise frustrate the statute's objective of providing for the critical regional need for low and moderate income housing does not violate the Home Rule Amendment.

3. *Does the Boards' or Committee's Exercise of their Power to Override Local Zoning Regulations Deemed Inconsistent with Local Needs Constitute Spot Zoning?*

The amici curiae argue that when the committee exercises its power to override local zoning by-laws deemed inconsistent with local needs, it engages in illegal spot zoning because its act singles out a particular parcel of property in a community for treatment different from that given to similar surrounding land indistinguishable from it in character.

However, we have frequently held that a spot zoning violation involves more than a mere finding that a parcel of property is singled out for less restrictive treatment than that of surrounding land of a similar character. If we accepted the amici curiae's test for spot zoning, the State could never exercise its undoubted power to override local zoning ordinances or by-laws for legitimate public purposes because there would always be a disparity of treatment between the area where the local ordinance or by-law is ignored and the rest of that zoning area where it is enforced. Moreover, zoning variances and amendments would also be subject to serious challenge on spot zoning grounds if the test were merely one of dissimilar treatment of similar parcels of property.

We stated the definition of spot zoning in *Lamarre* v. *Commissioner of Pub. Works of Fall River,* 324 Mass. 542, a case concerning a zoning amendment which converted a parcel of land that had previously been zoned as a single and general (not more than three family housing) residence district into a multi-family residence district. The local housing authority had requested the amendment and it had been approved by the local planning board and the city council because of a shortage of rental housing in Fall River. The facts of the *Lamarre* case are closely analogous to those in the instant case. In both cases, a particular parcel of property was singled out for treatment different from that given to surrounding property of a similar character. The only difference is that instead of the amendment of the local zoning regulation by municipal authorities as in the *Lamarre* case, c. 774 enables the board of appeals and the committee to avoid the effect of the applicable zoning restrictions when they are inconsistent with local needs, a difference which has no bearing on whether either decision constitutes spot zoning.

We held in the *Lamarre* case at 545–546, that "it [the zoning amendment] was not an instance of 'spot' zoning. 'It does not appear that there was "a singling out of one lot for different treatment from that accorded to similar

surrounding land indistinguishable from it in character, *all for the economic benefit of the owner of that lot."* ' *Marblehead* v. *Rosenthal,* 316 Mass. 124, 126. *Whittemore* v. *Building Inspector of Falmouth,* 313 Mass. 248, 249. See *Smith* v. *Board of Appeals of Salem,* 313 Mass. 622" (emphasis supplied). Our definition of spot zoning is in accord with the general view held by most State courts that spot zoning problems arise where a zoning change is designed solely for the economic benefit of the owner of the property receiving special treatment and is not in accordance with a well considered plan for the public welfare.[15] See Anderson, Am. Law of Zoning, § 5.04 and cases cited therein; *Jones* v. *Zoning Bd. of Adjustment of Long Beach,* 32 N. J. Super. 397.

Thus, the central question posed by this spot zoning challenge is whether the difference of treatment accorded by c. 774 serves the public welfare or merely affords an economic benefit to the owner of the land receiving special treatment. We decided in the *Lamarre* case that zoning changes affording special treatment to encourage the construction of multi-family residences in cities with housing shortages promote the public welfare. P. 546. We followed this decision in *Henze* v. *Building Inspector of Lawrence,* 359 Mass. 754, where we held that the need for low and moderate income housing justified a zoning reclassification of a parcel of land from a one and two-family residential district to a multi-family residential district.[16] We think these decisions are dispositive of

[15] Spot zoning is illegal on both statutory and constitutional grounds. The statutory violation rests on the fact that the exercise of zoning powers solely for the economic benefit of a private party goes beyond the enumerated public welfare purposes of the Zoning Enabling Act. See c. 40A, § 2. The *Lamarre* case, *supra,* 545. The test is whether there has been shown any substantial relation between the change in applicable zoning regulations and the furtherance of any general objects of the enabling act. Moreover, any exercise of the zoning powers in this manner which fosters "irrational treatment of people similarly situated" constitutes a denial of equal protection under the law guaranteed by the State and Federal Constitutions. See *Sinn* v. *Selectmen of Acton,* 357 Mass. 606, 611.

[16] Most State and Federal courts have rejected spot zoning claims where the zoning change contributed to the public welfare by promoting the construction of multiple dwellings in communities that

the spot zoning challenge. Chapter 774 reflects the Legislature's judgment that the special treatment accorded to a site proposed for the construction of low and moderate income housing and necessitated by exclusionary zoning practices serves the general welfare by promoting the construction of badly needed housing units in the suburbs. The statute's "consistent with local needs" standard and its provisions for judicial review of the board's and committee's decisions insure that special treatment will be allowed only when it serves the public interest. Thus, we hold that the exercise of c. 774's power to override local zoning by-laws and ordinances deemed inconsistent with local needs does not constitute spot zoning.

4. *Is c. 774 Unconstitutionally Vague?*

The boards contend that c. 774 improperly delegates legislative authority to an administrative agency and is void for vagueness because its provisions fail to provide standards sufficient to guide administrative action and to limit the exercise of untrammeled discretion. See *Smith* v. *Board of Appeals of Fall River*, 319 Mass. 341, 344. These constitutional claims of "void for vagueness" and unlawful delegation of legislative authority are closely related. The principal question posed by both claims is whether the statute is so vague "that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Commonwealth* v. *Carpenter*, 325 Mass. 519, 521. *O'Connell* v. *Brockton Bd. of Appeals*, 344 Mass. 208, 212. Such vagueness would permit "untrammeled [administrative] discretion" (*MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 638) and arbitrary and capricious decisions in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States and of art.

have housing shortages. See *Wolpe* v. *Poretsky*, 154 F. 2d 330, cert. den. 329 U. S. 724; *Malafronte* v. *Planning & Zoning Bd. of Milford*, 155 Conn. 205; *Hedin* v. *County Commrs. of Prince George's County*, 209 Md. 224; *Burford* v. *Austin*, 379 S. W. 2d 671 (Tex. Civ. App.). See also Anderson, Am. Law of Zoning, § 5.06, pp. 248–249.

10 of the Massachusetts Declaration of Rights. See *Connally* v. *General Constr. Co.* 269 U. S. 385, 391; *Ashton* v. *Kentucky*, 384 U. S. 195, 200; *Opinion of the Justices*, 358 Mass. 827, 829; *Opinion of the Justices*, 341 Mass. 760, 776.

The Concord board claims that "[t]he constitutional defect in G. L. c. 40B, §§ 20–23, is not that the standards provided local boards are not specific enough, but that the statute provides no standards at all for use by such boards in passing on applications for comprehensive permits under G. L. c. 40B, § 21." The boards' claim of lack of standards to guide their decisions rests on their assumption that the "consistent with local needs" and "uneconomic" standards referred to in § 23 and defined in §20 apply only to the committee's review of the boards' decisions. We cannot agree.

We must construe the statute, "if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408." *United States* v. *Jin Fuey Moy*, 241 U. S. 394, 401, cited in *Worcester County Natl. Bank* v. *Commissioner of Banks*, 340 Mass. 695, 701. Our construction of the statute must be made "upon the whole statute, [so] that no clause, sentence or word shall prove superfluous, void or insignificant, if, by any other construction they may all be made useful and pertinent." *Commonwealth* v. *McCaughey*, 9 Gray 296, 297. *Beloin* v. *Bullett*, 310 Mass. 206, 210.

Our examination of c. 774 leads us to conclude that the standards to be applied by boards of appeals in deciding whether to issue comprehensive permits are the same as those to be applied by the committee in reviewing the boards' decisions, namely, whether the grant of the permit is "reasonable and consistent with local needs" and whether any conditions imposed on the permit are "uneconomic." It is irrelevant that these standards are set forth in sections (§ 23 and § 20) different from the sec-

tion dealing expressly with the hearing before the board of appeals (§ 21) because §§ 20–23 must be construed as a whole. See *Massachusetts Medical Serv.* v. *Commissioner of Ins.* 344 Mass. 335, 338–339; *Commonwealth* v. *McCaughey, supra,* at p. 297. If the board's decision does not comply with these standards, its decision will be reversed by the committee on appeal, so by necessary implication its own decision must be based on the same standards. Any other construction of the statute would render the hearing before the board a useless procedure.

Finally, there is no merit to the claim that these standards are impermissibly vague. Section 20 contains detailed definitions of the factors to be considered by both the board of appeals and the committee in determining whether a proposal is "consistent with local needs" or whether conditions which might be imposed would render the construction or operation of the project "uneconomic." The "consistent with local needs" standard requires both the board and the committee to balance the regional need for low and moderate income housing against any objection to the details of the proposed plan. This standard requires the local board to consider the "regional need for low and moderate income housing . . . with the number of low income persons in the city or town affected" and with the local need to "protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces." § 20. In weighing these local concerns, the board must apply municipal requirements and regulations "as equally as possible to both subsidized and unsubsidized housing" applications. § 20.

Moreover, § 20 gives the board of appeals specific guidelines to aid its determination of whether the regional need for low and moderate income housing requires the board to override local "requirements and regulations," including restrictive zoning ordinances or

by-laws, which would prevent the board from approving a proposal that is otherwise "reasonable [17] and consistent with local needs." Section 20 provides that the board need not override local "requirements and regulations" where (1) "low or moderate income housing exists which is in excess of ten per cent of the housing units reported in the latest decennial census" or (2) such housing exists "on sites comprising one and one half per cent or more of the total land area zoned for residential, commercial or industrial use" (excluding public land) or (3) "the application before the board would result in the commencement of construction of such housing on sites comprising more than three tenths of one percent of such land area or ten acres, whichever is larger, in any one calendar year." § 20.

The value of these three specific alternative definitions of when local "requirements and regulations shall be considered consistent with local needs" is that they define precisely the municipality's minimum housing obligations "under the statute and permit it to do some intelligent, long-range planning about how and where the necessary housing should be built." Rodgers,[18] Snob Zoning in Massachusetts, 1970 Ann. Surv. Mass. Law, pp. 487, 490. These precise guidelines set forth in § 20 place a ceiling on the extent to which a local board *must override* local requirements and regulations, including exclusionary zoning laws, where the board decides that the application is reasonable and consistent with local needs.

Our construction of c. 774 does not mean that the board must automatically grant comprehensive permits in all cases where the community has not met its minimum

[17] Section 23 provides that the committee must decide whether the board's denial of an application or its approval with conditions imposed was "reasonable and consistent with local needs." Since the board's decision could be reasonable only if it was "consistent with local needs" as defined by § 20, the term "reasonable" is surplus verbiage which does not add any substance to the "consistent with local needs" standard. The word "reasonable" appears to be equated with the "consistent with local needs" standard.

[18] Allan G. Rodgers, codirector of the Massachusetts Law Reform Institute, was one of the principal draftsmen of c. 774.

housing obligation as it is specifically defined in § 20. The statute merely prevents the board from relying on local requirements or regulations, including applicable zoning by-laws and ordinances which prevent the use of the site for low and moderate income housing, as the reason for the board's denial of the permit or its grant with uneconomic conditions.

In cases where the locality has not met its minimum housing obligations, the board must rest its decision on whether the required need for low and moderate income housing outweighs the valid planning objections to the details of the proposal such as health, site design, and open spaces (see § 20). If the regional need for such housing outweighs these objections, the board must override any restrictive local requirements and regulations which prevent the construction of the housing and grant the comprehensive permit. However, the municipality's failure to meet its minimum housing obligations, as defined in § 20, will provide compelling evidence that the regional need for housing does in fact outweigh the objections to the proposal. See 7 Harv. J. on Legislation, 246.

However, once the municipality has satisfied its minimum housing obligation, the statute deems local "requirements and regulations," including its restrictive zoning ordinances or by-laws, as "consistent with local needs" and thereby enforceable by the board *if it wants to apply them.* In this situation, only the board retains the power to override these requirements and regulations in order to grant a comprehensive permit. This result reflects the Legislature's desire to preserve local autonomy once the community has satisfied its minimum obligation.[19]

---

[19] A recent law review article noted that c. 774 "was designed to motivate concern by the local municipalities for the needs of the public in general without depriving them of their home rules." The author noted that regional considerations were injected into local zoning decisions by the statute's definition of "consistent with local needs" which included a precise "mathematical formula" providing for a bare minimum of low or moderate income housing that must exist in the

We have upheld the constitutionality of statutes delegating broader authority to an administrative agency and creating less definite standards than those provided by § 20.[20]    See *Burnham* v. *Board of Appeals of Gloucester*, 333 Mass. 114; *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635.   These zoning cases support our conclusion that since the standards contained in c. 774 are more than adequate, the statute is neither void for vagueness nor an unlawful delegation of legislative authority.

   5. *Does c. 774 Require a De Novo Hearing before the Committee?*

Having determined the scope and the constitutionality of c. 774, we now discuss the questions raised by the boards concerning the procedural implementation of the statute.   The Concord and the Hanover boards both question the scope of the committee's power to review the boards' decisions.   The Concord board argues that the

---

city or town before exclusionary zoning practices can be enforced. "Thus, through these standards the state has maintained the home rule of the municipalities with regard to zoning, but has imposed minimum standards which must be followed." Comments, 22 Syracuse L. Rev. 465, 592, 593.

[20] We do not mean to imply that the statute is free of ambiguities. For example, § 20 defines "low or moderate income housing" as subsidized housing *"built or operated"* by a housing authority (emphasis supplied).   This language suggests that in situations like "turnkey" programs where a private builder constructs the desired housing and then sells or leases it to a housing authority, the housing authority could apply to a board of appeals for a comprehensive permit.   However, G. L. c. 40B, § 21, states that the public agency applicant must be "proposing to build" low or moderate income housing.   Given the broader "built or operate" definition of low and moderate income housing in § 20 and the fact that the public agency operating the housing is the real party in interest, we construe § 21 in light of § 20's definition of low and moderate income housing.   Therefore, a housing authority proposing to operate a program constructed by a private developer should be considered a proper applicant for a comprehensive permit.   "The duty of statutory interpretation is for the courts. Nevertheless, particularly under an ambiguous statute . . . the details of legislative policy, not spelt out in the statute, may appropriately be determined, at least in the first instance, by an agency charged with administration of the statute." *Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 344.   Therefore, any ambiguities which may remain in this statute can be resolved by administrative regulations promulgated by the Commissioner of Community Affairs.   See Rep. A. G., Pub. Doc. No. 12 (1970), p. 34.

committee's review of its decision permits only "a re-examination of . . . [the] proceeding for the purpose of preventing a result which may not be based on the exercise of an unbiased and reasonable judgment." The Hanover board argues that the committee is empowered to decide only whether, on the evidence presented to the board, its decision was reasonable. Both boards argue that the statute does not provide for a de novo hearing before the committee.

The boards point out that the statute's language provides that when an application for a comprehensive permit is denied by the board, the applicant may "appeal" to the committee for "review" of the decision. From the use of these words in the statute the boards argue that a de novo hearing before the committee was not intended. We cannot agree. The boards' argument would be more persuasive if these were the only words in the statute relating to the type of hearing to be held before the committee. The statute, however, indicates that the committee must conduct a de novo review of the application.

When a board of appeals has denied an application for a permit, c. 774 requires the committee to determine whether the board's decision was "reasonable and consistent with local needs." § 23. The statute provides that the committee "shall render a written decision . . . stating its findings of fact, its conclusions and the reasons therefor . . .." § 22. We believe that such language provides a clear indication that the Legislature intended that there should be a new evidentiary hearing before the committee at which the parties present evidence relevant to the issues to be decided. Rodgers, Snob Zoning in Massachusetts, 1970 Ann. Surv. Mass. Law, 487, 491. Chapter 774 also requires a stenographic record to be kept of the committee's hearing but makes no provision for such a record to be kept of the hearing before the board. § 22. This is further indication that the Legislature intended de novo review by the committee.

When making its decision, the committee has before it

a copy of the board's decision and a statement of the reasons upon which the decision was based. § 22. Chapter 774 does not indicate whether the committee is to give any weight to the board's decision or stated reasons. In view of the statute's requirement that the committee must find the facts, draw conclusions and state its own reasons for its decision, we believe that, although the board's decision and reasons (including any voluntary findings of fact made by the board) are competent evidence to enable the committee to ascertain the conclusions the board reached, the committee must make its own decision on the basis of a new evidentiary hearing.

The legal issues properly before the committee are circumscribed by c. 774. When the board has denied an application for a comprehensive permit, the committee is required to determine whether the board's decision was "reasonable and consistent with local needs." § 23. The phrase "consistent with local needs" is defined by § 20 in terms of factors that must be weighed in reaching a decision on the issuance of a permit. But the fact that the issues before the committee are clearly defined does not mean that the committee should not hear evidence related to those issues.

In reaching its decision the committee has before it the board's decision and its reasons for the denial of the application. It is quite possible that the board may not have included vital considerations in its list of stated reasons for its denial of the application either because they were not before the board or because they were considered irrelevant. If the committee is to fulfil its duty to determine whether the board's decision is in fact "reasonable and consistent with local needs" then the committee must be free to consider any evidence relevant to those issues.

The argument that a de novo hearing before the committee would permit the applicant to make a purely pro forma presentation before the board is not persuasive in light of our holding that the board has the power to grant applications for comprehensive permits, despite

contrary zoning laws. An applicant would be unlikely to choose an approach that would require two presentations, with added costs and delays, where one presentation could suffice. Furthermore, it is not likely that an applicant would risk alienating the board or the committee by such obvious tactics.

Although the committee stated that its hearings were not de novo, the record is clear that the committee did in fact base its decisions on new evidentiary hearings. The fact that the committee did not label its hearings de novo is not significant because c. 774 clearly requires de novo hearings before the committee.

6. *Are the Alternative Methods of Review Afforded an Applicant Who Has Been Denied a Permit and an Aggrieved Person Appealing from the Grant of a Permit Violative of the Equal Protection of the Laws Guaranteed by the Federal and Massachusetts Constitutions?*

The boards argue that the statute's provisions for alternative methods of review, depending upon whether the application has been granted or denied, violates the equal protection of the laws guaranteed by the Federal and the State Constitutions.[21] The thrust of these arguments was premised upon the view that the hearing before the committee was restricted to an inquiry into whether the board's decision was based upon "substantial evidence" (cf. G. L. c. 30A, §§ 1[6] and 14[8][e]) whereas the hearing before the court afforded an aggrieved person appealing from the grant of a permit is essentially a de novo review. G. L. c. 40B, § 21. G. L. c. 40A, § 21. See *Green* v. *Board of Appeal of Norwood,* 358 Mass. 253, 256. Since we hold that the statute requires the committee to hear any evidence relevant to the issue whether the denial of the application was reasonable and consistent with local needs, there are no substantial differences between the alternative methods of review.

---

[21] Fourteenth Amendment to the United States Constitution; arts. 1, 10, 11, 12, 29 of the Massachusetts Declaration of Rights.

7. *If the Committee Decides that the Boards' Decisions Are Incorrect, Must the Committee Remand the Cases to the Boards?*

The boards argue that if the committee decides that a board's decision is incorrect, then the committee must remand the case to the board so that the board may have an opportunity to correct its errors. Such a procedure would, however, be contrary to the plain language of the statute. Section 23 is explicit in its directives to the committee: "If the committee finds, in the case of a denial, that the decision of the board of appeals was unreasonable and not consistent with local needs, it shall vacate such decision and shall direct the board to issue a comprehensive permit or approval to the applicant." Any notion of a remand procedure (other than ordering the board to carry out the committee's decision) is precluded by the clear language of the statute. The absence of a remand procedure comports with the time limit fixed for each stage of the hearing process which together indicate the Legislature's intent to speed up the permit procedure and to facilitate the building of low and moderate income housing.

8. *Does the Committee Have the Power to Order the Issuance of Permits Subject to the Conditions as Specified?*

The Hanover board argues that the committee exceeded its authority in ordering the issuance of a permit with conditions that (a) stated that the drainage and sewage disposal systems must be approved by the appropriate State authorities, (b) empowered the board, at its option, to require the applicant to make a full disclosure concerning its leasing arrangements, and (c) set no time limits either for the fulfilment of the four specified conditions [22] or for the commencement or com-

---

[22] The committee's orders to the Hanover and Concord boards stated that the boards should grant the comprehensive permits subject to certain conditions. The conditions specified for the Hanover applicant were:

"1. Before beginning construction the Appellant shall provide the Board with satisfactory evidence that its proposed provisions for

pletion of the project. The board maintains that such a conditional permit is impermissible because it constitutes an advisory opinion and only partially commits the committee to the issuance of the permit.

It is clear that the committee may order the issuance of conditional permits. Chapter 774 gives a board the power to issue permits or approvals "including but not limited to the power to attach to said permit or approval conditions and requirements with respect to height, site plan, size or shape, or building materials as are consistent with the terms of this section." G. L. c. 40B, § 21. When a board has denied an application, the committee is empowered to vacate the board's decision

---

drainage and sewage disposal have received approval from the appropriate state authorities.

"2. If anything in the decision of this Committee would seem to permit the building or operation of such housing in accordance with standards less safe than the applicable building and site plan requirements of the Federal Housing Administration or the Massachusetts Housing Finance Agency, the standards of whichever agency is financially assisting such housing shall control.

"3. The Board shall, at its option, be empowered to attach a condition to the comprehensive permit that the permit is not effective until the appellant and lessor submit to the Board a statement setting forth in full detail the terms of the lease, and the reasons for electing to lease rather than to deed in fee simple. Such statement shall be in sufficient detail to satisfy the Board that it is a full disclosure, and shall be included as part of the appellant's application to the Massachusetts Housing Finance Agency (or other financing agency).

"Should disagreement arise between the Board and the Appellant on the question of sufficiency of the statement, certification by the Department of Community Affairs shall be adequate proof of compliance with the requirements of this condition.

"4. The comprehensive permit shall provide that local officials shall carry out compliance inspections in the usual manner. Should disagreement between the builder and local officials arise, certification by the Department of Community Affairs, if requested, shall be adequate proof of compliance with any requirement under the comprehensive permit."

The conditions specified for the Concord applicant were:

"1. Prior to commencement of construction, the petitioner shall secure the approval of the Commonwealth of Massachusetts, Department of Natural Resources, Division of Water Pollution Control of its connection to the Town of Concord sanitary sewer system.

"2. Prior to the commencement of construction, the petitioner shall secure the required approval under G. L. c. 131, § 40 (The 'Hatch Act').

"3. Prior to commencement of construction the petitioner will consult with and reach agreement with the Town of Concord Fire Chief and the Town of Concord Chief of Police concerning adequate pave-

if it is unreasonable and not consistent with local needs and to direct the board to issue a comprehensive permit or approval to the applicant. G. L. c. 40B, § 23. Since the committee is issuing an order for the board to act pursuant to the board's own power, and since the board is specifically authorized to issue conditional permits or approvals, it follows that the committee has the power to order the board to issue conditional permits or approvals.

To support its contention that the committee may not order the issuance of a permit subject to the conditions mentioned, the Hanover board has misplaced reliance upon *Weld* v. *Board of Appeals of Gloucester,* 345 Mass. 376, 378. In the *Weld* case, we held that the decision of the board of appeals granting a special permit to build a hotel subject to the condition that the "water situation must be arranged to the satisfaction of all concerned" was in excess of its authority to issue conditional per-

---

ment width within the development for passage of fire apparatus and adequate fencing around the proposed 10,000 square foot pond.

"4. The development shall contain a yield sign, sidewalk, and approach to the mechanical building for fire apparatus, hydrants, and fire alarm pedestal, all as suggested by the Chief of Police and Fire Chief in their memorandum to the Board of Appeals dated January 13, January 20, March 24, 1971.

"5. The development shall conform in all respects to the Building Code of the Town of Concord.

"6. The petitioner shall grant to the Town of Concord a conservation restriction as defined in G. L. Ch. 184, Sec. 31 in which petitioner undertakes to excavate a sump in Swamp Brook upstream of Sudbury Road, to excavate the ditches and that portion of Swamp Brook abutting the site, and to clean and keep free of silt the culvert beneath Sudbury Road.

"The comprehensive permit shall be subject to the following additional conditions:

"7. If anything in the decision of this Committee would seem to permit the building or operation of such housing in accordance with standards less safe than the applicable building and site plan requirements of the Federal Housing Administration of the Massachusetts Housing Finance Agency, the standards of whichever agency is financially assisting such housing shall control.

"8. The comprehensive permit shall provide that local officials shall carry out compliance inspections in the usual manner. Should disagreement between the builder and local officials arise, certification by the Department of Community Affairs, if requested, shall be adequate proof of compliance with any requirement under the comprehensive permit, or any of the other terms of this order."

mits, as defined by the enabling statute and the city zoning ordinance passed pursuant thereto. The objection to such a condition was that it invoked undefined standards and necessarily implied that the board would have to make a further determination to redefine the standard required.

In that case we stated that "[w]e assume that the board may condition the right to operate under a permit presently issued upon the completion of proposed work in accordance with identified plans or other *certain* standards" (emphasis supplied). We did not find the condition that "[t]he sewage disposal system shall be completed in accordance with plans previously filed, subject to the approval of the local and state boards of health," impermissible because the standards specified were sufficiently definite.

The two conditions objected to in the instant case set forth clear and certain standards by referring to "appropriate state authorities" with respect to the approval of the drainage and sewage systems, and "the Department of Community Affairs" with respect to the sufficiency of the disclosure of the leasing arrangement. These conditions are set forth in precise terms, with definite standards, and in no way constitute an advisory opinion.

The time within which the four conditions must be fulfilled is either stated directly (e.g., the first condition must be fulfilled "[b]efore beginning construction") or is implicitly an on-going process coinciding with the progress of the construction (e.g., the fourth condition provides that "local officials shall carry out compliance inspections in the usual manner"). The completion of the project necessarily depends upon numerous factors, including the outcome of this litigation. In the circumstances of this case it is within the committee's discretion to refuse to set final dates for the completion of the project.

9. *Are the Committee's Decisions Supported by "Substantial Evidence"?*

In reviewing the committee's decisions, the court,

whether the Superior Court in the usual case or this court to which the matter was reported, must decide whether there was "substantial evidence" to support those decisions, that is, "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, §§ 1 (6) and 14 (8) (e). *Boston Edison Co.* v. *Selectmen of Concord,* 355 Mass. 79, 92. *Labor Relations Commn.* v. *University Hosp. Inc.* 359 Mass. 516, 521. Jaffe, Judicial Control of Administrative Action, 596. The reviewing court must examine the committee's decisions "upon consideration of the entire record." G. L. c. 30A, § 14 (8). This statutory directive has been construed to require taking into account evidence that detracts from the weight of the supportive evidence. *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. 246, 253, citing by analogy *Universal Camera Corp.* v. *National Labor Relations Bd.* 340 U. S. 474, 488. The boards have argued that the committee's decisions are not supported by substantial evidence. However, we disagree.

*The Hanover Proceeding before the Committee.*

In deciding that the Hanover applicant should be granted a conditional permit the committee found that the board's denial of the application was unreasonable and not consistent with local needs. The committee made subsidiary findings of fact relating to the requirements of the statute and to the board's enunciated reasons for its decisions, all of which amply support the committee's decision.

The applicant sought a permit to build eighty-eight units of low and moderate income housing for elderly persons. The need for such housing was not disputed by the board. The committee had before it an exhibit prepared by the Metropolitan Area Planning Council referred to as "Maximum Housing and Annual Land Area Guidelines under Chapter 774 for Hanover, Massachusetts." This report indicated that there is a current need for low and moderate income housing in Hanover and that there is no such housing in the town. A town meet-

ing report showed that over 100 elderly Hanover residents desire and are eligible for such housing, and a 1969 supplement to the town plan projects a steady increase in elderly persons residing in Hanover. This, we believe, presented substantial evidence to support the committee's conclusion that the town of Hanover had not met its minimum housing obligations as defined by G. L. c. 40B, § 20.

The committee found that the applicant (Country Village Corporation) had sufficient property interest in the site to qualify as an applicant under c. 774.[23] The evidence before the committee revealed that the site is owned by George Oulton, president and treasurer of the applicant corporation, and his wife Anne R. Oulton, a director of the corporation. The Oultons had leased the land to the applicant under a fifty-five year term, to take effect on April 10, 1970, with renewal options for a further twenty years. Notice of this lease was filed with the register of deeds for Plymouth County on June 9, 1970.

The statute does not explicitly state the requisite property interest necessary to qualify as an applicant for a comprehensive permit. Section 21, however, specifies that "[a]ny public agency or limited dividend or non-profit organization proposing to build low or moderate income housing may submit to the board of appeals . . . a single application to build such housing . . .." Low or moderate income housing is defined as "any housing subsidized by the federal or state government under any program to assist the construction of low or moderate income housing as defined in the applicable federal or state statute . . .." G. L. c. 40B, §20.

In the instant case the Hanover applicant applied for funding to the Massachusetts Housing Finance Agency (established pursuant to St. 1966, c. 708), an appropriate State funding authority under c. 774. The committee had before it a letter from the Massachusetts Housing

---

[23] For conditions attached to the permit relating to the applicant's property interest in the site, see fn. 22, *supra.*

Finance Agency stating that "if the local approvals are given, or approval is secured through Chapter 774 of the Acts of 1969, a loan probably would be issued."

We believe that the statute's use of standards set by State or Federal funding agencies to define "low or moderate income housing" indicates that the Legislature intended to define the requisite property interest for a permit in terms of the selected financing agency's property interest requirements. Therefore, we believe that c. 774 does not require the applicant for a comprehensive permit to establish before the board or committee a present title in the proposed site.[24] However, such an interpretation does not prevent the board or the committee from requiring the applicant to disclose fully any property interest presently held in the site or plans to acquire any such interest.[25] The committee and the board have the power to order the issuance of a permit subject to the applicant's receiving financing from appropriate State or Federal programs. The applicant must, of course, satisfy any property interest requirements of the selected financing program before the funding issues and before the conditional permit becomes operative.

The committee was, therefore, warranted in finding that the Hanover applicant had sufficient property interest in the site.

Chapter 774 provides that an application for a comprehensive permit may be submitted only by a "public agency or limited dividend or nonprofit organization." The committee found that the Hanover applicant was a limited dividend organization within the meaning of the

[24] Such an interpretation is in accord with our holding that a public agency (which may have no present property interest in the site) proposing to operate low or moderate income housing should be considered a proper applicant for a comprehensive permit. See fn. 20, *supra.*

[25] The board's and the committee's power to require full disclosure of the applicant's present or planned property interest, and their power to grant conditional permits that do not become operative until the applicant has satisfied the funding agency's property interest requirements, provide ample protection against the unlikely possibility of frivolous applicants who have no present or potential property interest in the site.

statute. The rules and regulations for the business of the committee define a "limited dividend organization" as "any applicant which (a) proposes to sponsor housing under Chapter 40B, and (b) is not a public agency and (c) is eligible to receive a subsidy from a State or Federal Agency after a comprehensive permit has been issued." (Rules and Regulations of Housing Appeals Committee, 1 [f].) The Hanover applicant has set forth in its articles of organization the fact that the corporation is organized for the specific purpose of constructing low and moderate income homes and that the corporation may not make any distributions to stockholders, in any year, in excess of the amounts permitted for eligible funding applicants under the Massachusetts Housing Finance Agency's program. St. 1966, c. 708, § 5 (d). This provision was inserted in order to insure eligibility for State (and Federal) funding programs.

Testimony from the board chairman before the committee indicated that the board was prepared to leave the question of eligibility as a limited dividend organization to the appropriate State agencies. We believe that the board's interpretation of c. 774 (which is also enunciated in the regulations for the business of the committee) is in accordance with the intent of the statute. The eligibility of the applicant in this respect turns on the applicant's ability to qualify for the appropriate funding. To so qualify the applicant must propose to build "low or moderate income housing." Since the phrase "low or moderate income housing" is defined in c. 774 in terms of standards set by the selected subsidizing agency, we believe that the question of standards for eligibility as a limited dividend organization is properly left to the appropriate State or Federal funding agency. Such an interpretation does not prevent the board or the committee from requiring full disclosure of the organization's legal status and further requiring compliance with pertinent statutory and regulatory provisions.

Since the committee had before it a letter from the Massachusetts Housing Finance Agency stating that it

considered the applicant to be a limited dividend organization eligible for agency financing and since the applicant is proposing to build housing under c. 40B and is not a public agency, the committee was justified in finding that the applicant was a limited dividend corporation within the meaning of c. 774,

The Hanover board argues that before the committee can order the board to grant a comprehensive permit or approval, it must find "that there was a reasonable likelihood that the purported project would be subsidized by a federal or state agency." Section 21 of G. L. c. 40B states that the applicant shall be "proposing to build low or moderate income housing." The regulations for the business of the committee make it clear that such an applicant must be eligible to receive the appropriate funding. The letter submitted to the committee from the Massachusetts Housing Finance Agency stated in effect that the applicant was eligible for agency financing and that "if the local approvals are given, or approval is secured through Chapter 774 of the Acts of 1969, a loan probably would be issued." In view of this evidence the committee was warranted in concluding that the Hanover applicant was "proposing to build low or moderate income housing" within the meaning of c. 774.

Chapter 774 provides that one of the considerations in determining whether an applicant's proposal is "consistent with local needs" is "the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings . . .." G. L. c. 40B, § 20. The committee found that the applicant's plans were sufficient to satisfy these requirements. This finding was amply supported by the testimony. There was expert evidence that the increase in daily traffic generated by the project would be minimal and always far below the capacity of the surrounding streets. The plans submitted showed a parking space provided for every housing unit even though studies in similar projects in Boston suburbs showed that a ratio of one

parking space per 2.4 housing units would have provided adequate space for all cars likely to be owned by the project's inhabitants. The evidence before the committee was sufficient to warrant the conclusion that the proposed parking facilities in the applicant's project met the requirements of c. 774.

The committee's conclusion that the driveway plans were adequate was based upon plans showing a private way, twenty feet in width, running from Oakland Avenue to the project and terminating in a turn-around parking area, with a separate set of foot paths connecting the units and leading out of the project. There was evidence that the average street in Hanover is between eighteen and thirty-two feet wide and there was testimony by Hanover's police chief that Oakland Avenue, which also has a paved width of at least twenty feet, was adequate for emergency vehicles. The applicant's landscape plans were also shown to be adequate. There was testimony that many trees would remain on the site and that the topography of the site requires only a minimum of grading.

The committee's conclusion that the traffic, parking and landscape plans of the project met the requirements of c. 774 was thus supported by substantial evidence.

The committee found that the board's demand that the applicant should submit a revised set of plans for drainage and sewage disposal was unreasonable in view of the fact that new plans would be extremely expensive and that there was considerable doubt whether a permit would be issued by the board even if new plans were forthcoming. Since the board could have issued a permit subject to the condition of tendering a suitable disposal plan [26] and since these plans had to comply with State standards, whatever their particular design, the committee's decision that the board had unreasonably rejected the applicant's original plans was warranted.

[26] For conditions attached to the committee's order to the Hanover board to grant the permit, see fn. 22, *supra*.

*The Concord Proceeding before the Committee.*

In deciding that the Concord applicant should be granted a conditional permit the committee found that the Concord board's decision to deny the application was unreasonable and not consistent with local needs. The committee made subsidiary findings of fact which relate to the requirements of the statute and the board's enunciated reasons for its decision, all of which amply support the committee's decision.

The parties to the proceeding before the committee stipulated that there is both a regional need for low and moderate income housing and a local need for such housing within the town of Concord. Such housing within the town comprises less than ten per cent of the housing units according to the 1960 census and uses less than one and one-half per cent of the land in the town zoned for residential, commercial or industrial uses. Under the present zoning by-law only twenty-nine acres or one quarter of one per cent of the land in Concord zoned for residential, commercial or industrial uses is available for low and moderate income housing. These stipulations provide adequate support for the committee's conclusion that the town of Concord had not met its minimum housing obligations as defined by c. 774.

Both parties to the proceedings before the committee presented well qualified experts to testify to the efficacy of the applicant's plans to deal with the water problem. It was not disputed that the project site and the surrounding area are beset with difficult water problems. The committee took a view of the site in August, 1971, and observed the soggy and water laden ground in the lower parts of the land. The applicant's expert testified that the proposed measures to control the surface flooding and lower ground water levels would provide an adequate solution to the water problem.[27] In fact there was

---

[27] The measures to be undertaken were presented to the committee. On the lower southerly end of the site a storage pond was to be built to hold up to 20,000 cubic feet of water with a controlled release into

evidence that the proposed plans would not only provide an adequate system for the residents of the project but might also improve the water problems of the surrounding area. We therefore conclude that there was substantial evidence before the committee that the applicant's proposed plans were adequate.

We have reviewed the committee's decisions on the Hanover and the Concord applications "upon consideration of the entire record" and conclude that both decisions were supported by substantial evidence.

10. In conclusion, c. 774 represents the Legislature's attempt to satisfy the regional need for housing without stripping municipalities of their power to zone. By creating a "consistent with local needs" criterion which expands the scope of relevant local needs considered by the local boards to include the regional need for low and moderate income housing, the Legislature has given the boards the power to override the local exclusionary zoning practices in order to encourage the construction of such housing in the suburbs. By fixing a ceiling on the extent to which a board must override local zoning regulations, the Legislature has clearly delineated that point where local interests must yield to the general public need for housing. This ceiling establishes the minimum share of responsibility that each community must shoulder in order to alleviate the housing crisis that confronts the Commonwealth.

As we noted in *Simon* v. *Needham*, 311 Mass. 560, 565–566, the municipality's power to control its character and land usages by its zoning regulations is not unlimited. "A zoning by-law cannot be adopted for the purpose of setting up a barrier against the influx of thrifty and respectable citizens who desire to live there and who

---

Swamp Brook. A series of leaching basins were to pick up surface water, and water from roofs and patios was to be directed into the ground. This surface water system was designed to handle extreme water levels up to a "once-in-ten-year storm."

Surrounding ditches were to be dredged and widened and the bed of Swamp Brook was to be lowered six inches. A settling basin was designed to safeguard against sediment hazards.

are able and willing to erect homes upon lots upon which fair and reasonable restrictions have been imposed nor for the purpose of protecting the large estates that are already located in the district. The strictly local interests of the town must yield if it appears that they are plainly in conflict with the general interests of the public at large, and in such instances the interest of 'the municipality would not be allowed to stand in the way.' *Euclid* v. *Ambler Realty Co.* 272 U. S. 365, 390. See *Eubank* v. *Richmond,* 226 U. S. 137, 144; *Edwards* v. *California,* 314 U. S. 160; *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371; *Bradley* v. *Zoning Adjustment Board of Boston,* 255 Mass. 160, 162; . . . *State* v. *Stahlman,* 81 W. Va. 335."

The legislative reports which prompted c. 774's passage demonstrated how local restrictive zoning regulations have set up, in fact if not intentionally, a barrier against the introduction of low and moderate income housing in the suburbs. Moreover, this barrier exists at a time when our housing needs for the low and moderate income groups cannot be met by the "inner cities." This housing crisis demands a legislative and judicial approach [28]

---

[28] Although comprehensive legislation seems the most rational and efficient way of combatting exclusionary zoning practices by the suburbs, some courts, in States where the Legislature has not acted to remedy the problem, have struck down restrictive zoning requirements on substantive due process and equal protection grounds. See *Girsh Appeal,* 437 Pa. 237 (1970) (Pennsylvania Supreme Court held that the failure to provide for apartments anywhere in a particular town was unconstitutional denial of due process even though multifamily residences were not expressly prohibited). The court emphasized that in examining whether a particular zoning regulation promoted the general welfare, it would consider the external effects of the regulation on other cities as well as the internal effects on the particular city's welfare. "Perhaps in an ideal world, planning and zoning would be done on a *regional* basis, so that a given community would have apartments, while an adjoining community would not. But as long as we allow zoning to be done community by community, it is intolerable to allow one municipality (or many municipalities) to close its doors at the expense of surrounding communities and the central city." P. 245, fn. 4. See also *County Supervisors of Fairfax County, Virginia* v. *Carper,* 200 Va. 653 (Virginia Supreme Court of Appeals invalidated a two acre minimum lot size requirement because its effect was to exclude low income groups from the area).

However, many State courts have upheld restrictive zoning regulations (e.g., minimum lot size requirements) despite their exclusionary impact on low and moderate income groups on the ground that these

that requires "the strictly local interests of the town" to yield to the regional need for the construction of low and moderate incoming housing. Chapter 774 represents the Legislature's use of its own zoning powers to respond to this problem.

The Legislature's zoning power may be used "where the interests of the public require such action and where the means employed are reasonably necessary for the accomplishment of the purpose." *Simon* v. *Needham,* 311 Mass. 560, 562. Within these broad limits, the General Court is the sole judge as to how and when the power is to be exercised as long as it acts in accordance with the powers reserved to it by § 8 of the Home Rule Amendment. Our responsibility in examining the Legislature's exercise of its zoning power is limited to the determination of whether the legislation adopts a reasonable means to serve a legitimate public purpose. Our analysis of c. 774's legislative history and text leads us to conclude that the Legislature's adoption of an administrative mechanism designed to supersede, when necessary, local restrictive requirements and regulations, including zoning by-laws and ordinances, in order to promote the construction of low and moderate income housing in cities and towns is a constitutionally valid exercise of the Legislature's zoning power which was properly implemented in the proceedings before us.

In each case, a decree shall be entered in the Superior Court affirming the decision of the Housing Appeals Committee.

<em>So ordered.</em>

---

regulations have a rational relationship to the *local* community's general welfare. These courts refused to consider the external effects of exclusionary zoning practices on other cities because they were not considered relevant to the determination of whether the local community's general welfare was advanced. See *Zygmont* v. *Planning & Zoning Commn. of Greenwich,* 152 Conn. 550; *Homeck* v. *County of Cook,* 12 Ill. 2d 257; *Flora Realty & Inv. Co.* v. *Ladue,* 362 Mo. 1025, app. dism. 344 U. S. 802; *Bilbar Constr. Co.* v. *Easttown Township Bd. of Adjustment,* 393 Pa. 62.

For a discussion of recent legislative and judicial attacks against exclusionary zoning, see 7 Harv. J. on Legislation, 246; 22 Syracuse L. Rev. 465; Notes, 84 Harv. L. Rev. 1645; 69 Univ. of Mich. L. Rev. 339; 23 Stanford L. Rev. 767.